TRANSPORTATION-COMMUNICATION
EMPLOYEES UNION *v.* UNION
PACIFIC RAILROAD CO.

No. 28.   Argued October 19, 1966.—Decided December 5, 1966.

*Milton Kramer* argued the cause for petitioner.   With him on the briefs were *Lester P. Schoene* and *Martin W. Fingerhut.*

*James A. Wilcox* argued the cause for respondent. With him on the brief was *H. Lustgarten, Jr.*

*Clarence M. Mulholland, Edward J. Hickey, Jr.,* and *Richard R. Lyman* filed a brief for the Railway Labor Executives' Association, as *amicus curiae,* urging reversal.

MR. JUSTICE BLACK delivered the opinion of the Court.

Transportation-Communication Employees Union, the petitioner, is the bargaining representative of a group

of railroad employees commonly known as "Telegraphers." Prior to 1952 these telegraphers were commonly assigned the duty of sending, by telegraph, railroad way bills, manifests and orders prepared by clerks, members of the brotherhood of Railway Clerks. In 1952, however, the respondent here, Union Pacific Railroad Company, installed IBM machines which resulted in a radical change in the workload of the telegraphers and clerks. When the clerical work previously done by the clerks is manually performed on the IBM machines, the machines automatically perform the communications functions previously performed by the telegraphers. As a result, the railroad's need for telegraphers was practically eliminated and operation of the IBM machines was assigned to members of the clerks' union. This case arises out of the dispute over the railroad's assignment of these jobs to the clerks. The telegraphers' union, claiming the jobs for its members under its collective bargaining agreement, protested the railroad's assignment and, in due course, referred its claim to the Railroad Adjustment Board as authorized by § 3 First (i) of the Railway Labor Act.[1] Notice of the referral was given to the clerks' union, which, pursuant to an understanding with the other labor unions, declined to participate in this proceeding on the ground that it had no interest in the matter but stated its readiness to file a

---

[1] This section provides:

"The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, . . . shall be handled in the usual manner . . . but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes." 44 Stat. 578, as amended, 48 Stat. 1191, 45 U. S. C. § 153 First (i).

like proceeding before the Board to protect its members should any of their jobs be threatened.[2] The Board then heard and decided the case without considering the railroad's liability to the clerks under its contract with them, concluded that the telegraphers were entitled to the jobs under their contract, and ordered that the railroad pay the telegraphers who had been idle because of the assignment of the jobs to the clerks. The telegraphers' union then brought this action in a United States District Court to enforce the Board's award as authorized by § 3 First (p) of the Act. That court dismissed the case on the ground that the clerks' union was an indispensable party, and that the telegraphers, though given the opportunity, refused to make it a party. 231

---

[2] Section 3 First (j) of the Act, 45 U. S. C. § 153 First (j), requires the Adjustment Board to "give due notice of all hearings to the employee or employees and the carrier or carriers *involved* in any disputes submitted to them." (Emphasis supplied.) Prior to this case it was the policy of the various railroad unions, including the clerks' and telegraphers', in work-assignment disputes submitted to the Board, to refuse to give notice of and to prohibit participation in Board proceedings by anyone but the involved railroad and the petitioning union. This policy, followed by the labor members of the Board, resulted in no notice being given to the nonpetitioning union. See *Whitehouse* v. *Illinois Cent. R. Co.*, 349 U. S. 366, 372. In 1959, after some courts had refused to enforce the Board's awards where it had failed to notify the nonpetitioning union, see, *e. g.*, *Order of R. R. Telegraphers* v. *New Orleans, T. & M. R. Co.*, 229 F. 2d 59, cert. denied, 350 U. S. 997, the Railway Labor Executives' Association, composed of the various railroad unions, changed this policy to the extent that notice would henceforth be given to nonpetitioning unions. Yet the Railway Labor Executives' Association prescribed a form-letter response—to be sent by the notified nonpetitioning union to the Board—which disavowed any interest in the dispute and declined the opportunity to participate before the Board except in a subsequent and separate proceeding initiated by the nonpetitioning union in the event the Board's decision adversely affected its members' jobs. The clerks' union used this form letter to respond to the § 3 First (j) notice in the instant case.

F. Supp. 33. Affirming the dismissal, the Court of Appeals pointed out that the Board had failed to carry out its exclusive jurisdictional responsibility to decide the entire dispute with relation to the conflicting claims of the two unions under their respective contracts to have the jobs assigned to their members.[3]  We granted certiorari in order to settle doubts about whether the Adjustment Board must exercise its exclusive jurisdiction to settle disputes like this in a single proceeding with all disputant unions present.  Cf. *Whitehouse* v. *Illinois Cent. R. Co.*, 349 U. S. 366, 371–372.  We hold that it must.

## I.

Petitioner contends that it is entirely appropriate for the Adjustment Board to resolve disputes over work assignments in a proceeding in which only one union participates and in which only that union's contract with the employer is considered.  This contention rests on the premise that collective bargaining agreements are to be governed by the same common-law principles which control private contracts between two private parties.  On this basis it is quite naturally assumed that a dispute over work assignments is a dispute between an employer and only one union.  Thus, it is argued that each collective bargaining agreement is a thing apart from all others and each dispute over work assignments must be decided on the language of a single such agreement considered in isolation from all others.

We reject this line of reasoning.  A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law concepts which control such pri-

---

[3] The Court of Appeals' controlling opinion is reported at 349 F. 2d 408.  A prior opinion which was withdrawn is unofficially reported at 59 L. R. R. M. 2993.

vate contracts. *John Wiley & Sons* v. *Livingston*, 376 U. S. 543, 550; cf. *Steele* v. *Louisville & N. R. Co.*, 323 U. S. 192. ". . . [I]t is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. . . . The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant." *United Steelworkers of America* v. *Warrior & Gulf Nav. Co.*, 363 U. S. 574, 578–579. In order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements. This is particularly true when the agreement is resorted to for the purpose of settling a jurisdictional dispute over work assignments.

There are two kinds of these jurisdictional disputes. Both are essentially disputes between two competing unions, not merely disputes between an employer and a single union. The ordinary jurisdictional dispute arises when two or more unions claim the right to perform a job which existed at the time their collective bargaining contracts with the employer were made. In such a situation it would be highly unlikely that each contract could be construed as giving each union the right to be paid for the single job. But the dispute before us now is not the ordinary jurisdictional dispute where each union claims the right to perform a job which existed at the time its collective bargaining agreement was made. Here, though two jobs existed when the collective bargaining agreements were made and though the railroad properly could contract with one union to perform one job and the other union to perform the other, automation has now resulted in there being only one job, a job which is different from either of the former two jobs and which was not expressly contracted to either of the unions. Although only one union can be assigned this

new job, it may be that the railroad's agreement with the nonassigned union obligates the railroad to pay it for idleness attributable to such job elimination due to automation. But this does not mean that both unions can, under their separate agreements, have the right to perform the new job or that the Board, once the dispute has been submitted to it, can postpone determining which union has the right to the job in the future. By first ordering the railroad to pay one union and then later, in a separate proceeding, ordering it to pay the other union, without ever determining which union has the right to perform the job and thus without ever prejudicing the rights of the other union, the Board abdicates its duty to settle the entire dispute. Yet this is precisely the kind of merry-go-round situation which the petitioner claims is envisaged by the Act, a procedure which certainly does not "provide for the *prompt* and *orderly* settlement of *all* disputes . . . ," the purpose for which the Adjustment Board was established. § 2 (5). (Emphasis supplied.)

## II.

The railroad, the employees, and the public, for all of whose benefits the Railway Labor Act was written, are entitled to have a fair, expeditious hearing to settle disputes of this nature. And we have said in no uncertain language that the Adjustment Board has jurisdiction to do so. *Order of Railway Conductors* v. *Pitney,* 326 U. S. 561, was decided 20 years ago. That case concerned a dispute over which employees should be assigned to do certain railroad jobs—members of the conductors' union under their contract or members of the trainmen's union under their contract. In that case a district court, in charge of a railroad in bankruptcy, had entered a judgment in favor of the conductors. We reversed, holding that the Railway Labor Act vested exclusive power in the Adjustment Board to decide that controversy over

job assignments. It is true that we did not precisely decide there that the Board must bring before it all unions claiming the same jobs for their members, but we did say this:

"We have seen that in order to reach a final decision on that question the court first had to interpret the terms of O. R. C.'s collective bargaining agreements. The record shows, however, that interpretation of these contracts involves more than the mere construction of a 'document' in terms of the ordinary meaning of words and their position. . . . *For O. R. C.'s agreements with the railroad must be read in the light of others between the railroad and B. R. T. And since all parties seek to support their particular interpretation of these agreements by evidence as to usage, practice and custom, that too must be taken into account and properly understood.* The factual question is intricate and technical. An agency especially competent and specifically designated to deal with it has been created by Congress." *Id.,* at 566–567. (Emphasis supplied.)

Four years after *Pitney* we decided *Slocum* v. *Delaware, L. & W. R. Co.,* 339 U. S. 239. In that case a state court had interpreted collective bargaining contracts between a railroad and the same two unions here and had decided in favor of the clerks. We reversed, and, relying on *Pitney,* said:

". . . There we held, in a case remarkably similar to the one before us now, that the Federal District Court in its equitable discretion should have refused 'to adjudicate a jurisdictional dispute *involving the railroad and two employee accredited bargaining agents* . . . .' Our ground for this holding was that the court 'should not have interpreted the contracts' but *should have left this question for determination*

*by the Adjustment Board, a congressionally desig-
nated agency* peculiarly competent in this field. 326
U. S., at 567–568." *Id.*, at 243–244. (Emphasis
supplied.)

We adhere to our holdings in *Pitney* and *Slocum* that
the Adjustment Board does have exclusive jurisdiction to
hear and determine disputes like this. See also *Order
of Railway Conductors of America* v. *Southern R. Co.*,
339 U. S. 255. Petitioner argues that we are barred
from this holding by *Whitehouse* v. *Illinois Cent. R. Co.*,
349 U. S. 366, decided after *Pitney* and *Slocum*. There
is some language in *Whitehouse* which, given one inter-
pretation, might justify an inference against the Adjust-
ment Board's jurisdiction fully to decide this case in a
single proceeding. But in the final analysis the *holding*
in *Whitehouse* was only that the primary jurisdiction of
the Adjustment Board could not be frustrated by a pre-
mature judicial action. Cf. *Carey* v. *Westinghouse Elec.
Corp.*, 375 U. S. 261, 265–266. We decline to expand
that case beyond its actual holding.

The Adjustment Board has jurisdiction, which peti-
tioner admits, to hear and decide the controversy over the
interpretation of the telegraphers' contract with the
railroad as it relates to the work assignments. And
§ 3 First (j) provides that "the several divisions of the
Adjustment Board shall give due notice of all hearings
to the employee or employees and the carrier or carriers
involved in any disputes submitted to them." The clerks'
union was given notice here as it should have been under
§ 3 First (j). Certainly it is "involved" in this dispute.
Without its presence, unless it chooses to default and
surrender its claims for its members, neither the Board
nor the courts below could determine this whole dispute.
As respondent contends, to decide, as the Board has here,
that the telegraphers are entitled to be paid for these
jobs creates another controversy for the railroad with the

clerks who have the jobs now. For should the Board's order be sustained, the railroad would not only have to make back payments to the telegraphers who have done no work but would be compelled to continue to pay two sets of workers—one set being idle. The Adjustment Board, as we said about the National Labor Relations Board in *Labor Board* v. *Radio & Television Broadcast Engineers,* 364 U. S. 573, 582–583, can, with its experience and common sense, handle this entire dispute in a satisfactory manner in a single proceeding.

We affirm the judgment of the Court of Appeals in holding that the clerks' union should be a party before the Board and the courts to this labor dispute over job assignments for its members. The cause should be remanded to the District Court with directions to remand this case to the Board.[4] The Board should be directed to give once again the clerks' union an opportunity to be heard, and, whether or not the clerks' union accepts this opportunity, to resolve this entire dispute upon consideration not only of the contract between the railroad and

---

[4] The Court of Appeals in affirming the dismissal of the telegraphers' union's petition for enforcement was quite correct in holding that the failure of the clerks to appear before the Board and of the Board to consider the contract between the clerks and the railroad could not be cured merely by joinder of the clerks' union in the District Court's enforcement proceeding. The Board had the exclusive jurisdiction to consider the clerks' contract and any claim they might have asserted under it. At the time, the Court of Appeals had no alternative but to affirm the dismissal by the District Court, for district courts could only "enforce or set aside" the Board's orders under § 3 First (p). They could not remand cases to the Board. This was changed on June 20, 1966, by Pub. L. No. 89–456, § 2 (e), 80 Stat. 209, which inserted a new provision, § 3 First (q), empowering district courts to remand proceedings to the Board. In view of the Board's failure to consider all of the issues and the clerks' understandable refusal to participate because of the then existing doubt as to whether they could be bound by the Board's decision, we conclude it appropriate to use this new availability of remand to the Board.

the telegraphers, but "in the light of . . . [contracts] between the railroad" and any other union "involved" in the overall dispute, and upon consideration of "evidence as to usage, practice and custom" pertinent to all these agreements. *Order of Railway Conductors* v. *Pitney, supra,* at 567. The Board's order, based upon such thorough consideration after giving the clerks' union a chance to be heard, will then be enforceable by the courts.

*It is so ordered.*

MR. JUSTICE STEWART, whom MR. JUSTICE BRENNAN joins, concurring.

Until now the Adjustment Board has dealt with the claim of the telegraphers as though it were totally unrelated to the claim of the clerks. To take this piecemeal approach to the underlying causes of this controversy not only invites inconsistent awards, but also ignores the industrial context in which the disputed contract was framed and implemented.

This case aptly illustrates why the Board cannot judge one-half of a problem while closing its eyes to the other half. The disputed provisions of the collective agreement were drawn before technological progress telescoped two work stations into one. The agreement did not explicitly provide for such a change. But it was designed to cover an extended period of time, and its language is sufficiently general to allow for flexibility in the light of changing circumstances.*

---

*Among the rules of the Telegraphers' Agreement invoked in this dispute, the following are the most relevant:

ARTICLE 1—SCOPE.

Rule 1. This agreement will govern the wages and working conditions of agents, agent-telegraphers, agent-telephoners, telegraphers, telephoners, telegrapher-clerks, telephoner-clerks, telegrapher-car distributors, ticket clerk-telegraphers, telegrapher-switch-tenders, C. T. C. telegraphers, train and tower directors, towermen, lever-

To do justice to the parties in this situation the Board must take full measure of their circumstances. To justify the deference which the law has given to its deci-

men, block operators, staffmen, managers, wire chiefs, repeater chiefs, chief operators, printer mechanicians, telephone operators (except switchboard operators), teletype operators, printer operators, agents non-telegraphers, and agents non-telephoners herein listed.

### ARTICLE 2—POSITIONS AND RATES OF PAY.

Rule 5. General Telegraph Offices. (a) Positions and rates of pay in general telegraph offices under the jurisdiction of the Superintendent Telegraph shall be as follows:

4 Las Vegas "VG"

| | |
|---|---|
| Manager | 2.127 |
| 2d chief operator-printer m[e]chn | 1.995 |
| 3d chief operator-printer mechn | 1.995 |
| Telegrapher | 1.851 |

Rule 6. New Positions. The wages of new positions shall be in conformity with the wages of positions of similar kind or class in the seniority district where created.

### ARTICLE 3—TIME ALLOWANCES.

Rule 10. Daily Guarantee. Regularly assigned employes will receive eight hours pay for each twenty-four hours, at rate of position occupied . . . .

### ARTICLE 6—SENIORITY.

Rule 47. Promotion. (a) Promotion shall be based on seniority and qualifications; qualifications being sufficient, seniority will prevail.

### ARTICLE 8—GENERAL.

Rule 62. Train Orders. No employe other than covered by this schedule and train dispatchers will be permitted to handle train orders at telegraph or telephone offices where an operator is employed, and is available, or can be promptly located, except in an emergency, in which case the telegrapher will be paid for the call.

Rule 70. Date Effective and Change. This agreement will be effective as of January 1, 1952, and shall continue in effect until it is changed as provided herein, or under the provisions of the Railway Labor Act.

sions, the Board must employ a decision-making technique that rests on fair procedure and industrial realities. By using a simple bilateral contract analysis the Board defaults in both of these duties. Cf. Cox, The Legal Nature of Collective Bargaining Agreements, 57 Mich. L. Rev. 1, 22–23, 26–27 (1958); Note, 75 Yale L. J. 877, 889–890 (1966).

Only by proceeding as the Court today directs can the Board properly decide cases of this kind. The provisions in the Railway Labor Act which state that the Board's orders are to be directed only against the carrier do not detract from the power of the Board to fulfill its tasks. For if the telegraphers and the clerks both advanced their claims and the Board directed the carrier to honor the claims of only one union, the other union would be bound just as though it had lost in a multilateral *in rem* proceeding. See 3 Freeman, The Law of Judgments §§ 1524–1526 (5th ed. 1925).

Since the Board has failed to use procedures which allow for an informed and fair understanding of the dispute between the petitioner and respondent, I concur in the opinion and judgment of the Court.

MR. JUSTICE FORTAS, with whom THE CHIEF JUSTICE joins, dissenting.

This case involves a dispute between the telegraphers' union and a railroad as to whether the union's members, under its collective bargaining agreement with the carrier, were entitled to certain jobs (or compensatory payments in lieu thereof) which the carrier had unilaterally allotted to another union, the clerks. The telegraphers complained to the Railroad Adjustment Board. The Board held that, under the contract between the telegraphers and the railroad, the telegraphers' members had a right to the jobs, and it ordered the carrier to make compensatory payments to the senior telegrapher idled by its action.

The Court now holds that such an award will not be enforced because the clerks' union was not a party to the proceeding, and because the Board merely adjudicated the rights of the telegraphers and did not determine whether the clerks were entitled to the jobs instead. The Court's opinion states that the jobs in question must belong to one union or the other, and that it is the Board's duty to decide which of the two unions is entitled to the jobs.

I dissent. The Board acted as the statute commands. As I shall discuss, its power is limited to adjudications of grievances and contract disputes between a union and a railroad. It cannot compel conversion of a complaint proceeding between a union and a railroad into a three-party proceeding to "settle the entire dispute." Certainly the courts should not refuse to enforce its award because the Board has failed to do something which the statute does not require or empower it to do. I also emphatically submit that this Court should neither devise nor impose upon the Board or upon management and labor, the proposition, making its debut in this case in the field of railway labor law, that "only one union can be assigned this new job." There is nothing in the statute or precedents that permits or justifies this peremptory judicial foray into other people's business.

The basis of the Court's holding cannot be found in any provision of the Railway Labor Act. 44 Stat. 577 (1926), as amended, 45 U. S. C. §§ 151–188 (as amended by Act of June 20, 1966, 80 Stat. 208). The Court adverts to § 2 of the Act, which sets forth the purposes of the Railway Labor Act (including, of course, provisions relating to the National Mediation Board and provisions creating general duties and rights of carriers and employees—none of which defines the powers of the Adjustment Board). Section 2 sets forth a number of purposes, among which appears the phrase quoted in part by the Court: "(4) to provide for the prompt and orderly settle-

ment of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." To the extent to which these provisions relate specifically to the purposes of the Adjustment Board, they do not define its powers. The Board's powers are specifically defined and limited in § 3 First (i) of the Act. The Court begs the question by giving to the phrase "settlement of all disputes" a meaning which disregards both the qualifying language of § 2 itself, and the specific enumeration of powers in § 3 First (i).

Ultimately, however, the Court appears to rest its decision not upon the Act, but upon a "principle" which it now creates. That proposition—unknown to railway labor law until this day—is that, whatever the parties' contract provides, the Board must observe and enforce the rule that "only one union can be assigned this new job." The Court holds that even if "the railroad's agreement with the nonassigned union obligates the railroad to pay it for idleness attributable to such job elimination due to automation," the Board cannot conclude "that both unions can, under their separate agreements, have the right to perform the new job. . . ." It is because of this controlling principle that the Court asserts it was error for the Board to make an award unless the award would bind the clerks' union as well. Throughout its opinion the Court stresses that there is now but one "job" and that only one union's member can have "the right to the job." Obviously only one person can actually *do* the job; but the Board held only that a telegrapher was entitled to be *paid* for the job. In fact, the Court is—without articulating its premise—assuming that featherbedding is forbidden by natural law or

some other type of mandate that overrides contract, and that it is the Board's duty to enforce the prohibition. From this novel premise it derives its conclusion that the award was not enforceable.

There is no basis in the Railway Labor Act for either of the Court's propositions: that both unions must be parties to a proceeding initiated by one of them, or that the Board must "settle the entire dispute" by determining that one or the other (but not both) of the unions has title to the jobs. The Court's predilection for one job, one man may be sensible, but it may also be contrary to contract; and I know of no provision in the Constitution or statutes or decided cases that compels it. There is no basis for this Court to dictate—and that is what it is here doing—that a collective bargaining contract may not be enforced in accordance with its terms but must be subordinated to a one job, one man theory. This Court cannot and should not impose its own views. The anti-featherbedding principle may or may not be an admirable theory, depending upon one's preconceptions and point of view. It does not now exist in the railway labor field. And I respectfully suggest that this Court is in no position to assess the desirability of its judicial innovation. If featherbedding in the railroad industry is to be declared unlawful, it should not be this Court which does it. To say the least, the problems are too esoteric and too volatile to be the subject of judicial edict. They should be left to the parties and the legislature. Certainly, this Court should not invade the integrity of collective bargaining contracts to legislate the result it considers desirable or "orderly."

Only last Term this Court considered one of the peculiar institutions of railway labor, and sustained the validity of state "full-crew" statutes. These statutes, in direct contrast to the one job, one man principle

that the Court today assumes, have the effect sometimes of requiring railroads to hire one man, no job. The Court sustained these statutes against claims, among others, that Congress in the Railway Labor Act had preempted the field. *Engineers* v. *Chicago, R. I. & P. R. Co.*, 382 U. S. 423 (1966). Such a "sensitive and touchy problem" (*id.*, at 430), the Court wisely decided, was to be left to collective bargaining and the States in the absence of a clear congressional command. It is hard to comprehend the *Engineers* case if, as the Court now finds, the Railway Labor Act itself (presumably ever since its enactment in 1926) or other overriding law forbids what "full-crew" laws command. Certainly, the present problem, if it is a different one at all, is equally "sensitive and touchy," and the Court has yet to disclose the congressional authority dictating contrary treatment.

Prior decisions of this Court are of no assistance. The Court first refers to *Order of Railway Conductors* v. *Pitney*, 326 U. S. 561 (1946). The Court candidly states that "we did not precisely decide there that the Board must bring before it all unions claiming the same jobs for their members . . . ." All that the Court decided in *Pitney* was that a dispute between two unions claiming a right to certain jobs had first to be determined by the Railroad Adjustment Board, and could not be decided initially by a bankruptcy court in reorganization proceedings. The passage from *Pitney* quoted by the Court merely states that the decision of the issue—the interpretation of the conductors' collective bargaining contract—had to be made in light of usage, practice and custom, and of other agreements between the railroad and the trainmen. Indeed, the quotation from *Pitney* recalls the basic principle that the Court here ignores: that in the "intricate and technical" field of railway labor relations, no court, including this Court, should displace

the agency which Congress has vested with authority—certainly not with the drastic imposition of a mandate to eliminate featherbedding.

It is, however, essential to note that there is absolutely no reason to believe that the Board failed to follow *Pitney* here. Both the majority and concurring opinions assume as fact that the Adjustment Board violated the duty declared in *Pitney* to construe the telegraphers' contract in light of the clerks' contract and railroad usage, practice and custom. Thus the majority characterizes the Board's proceedings in this case as one "in which only [the telegraphers'] . . . contract with the employer [was] . . . considered." The concurrence asserts that "Until now the Adjustment Board has dealt with the claim of the telegraphers as though it were totally unrelated to the claim of the clerks," and has used "a simple bilateral contract analysis" which prevented it from arriving at "an informed and fair understanding of the dispute between the petitioner and respondent." I am unable to find in the record before this Court any support for these suggestions that the Adjustment Board failed to perform its duty by refusing to consider the clerks' contract for its evidentiary value.[1]

The award of the Board makes clear that both practice and usage, and the possibly conflicting contractual claim

---

[1] The Court of Appeals' opinion asserts that the Board's rules of evidence excluded other contracts, and that the Board dealt with the case as if the clerks' contract did not exist. There is nothing in the record which suggests that at any time, in any way, the Board excluded references to the clerks' contract or treated it as irrelevant. If the Court of Appeals were correct as to the Board's rules, those rules would plainly be contrary to law and common-sense evidentiary principles. The railroad's submission to the Board, in demanding that notice be given the clerks' union (as it was), specifically invoked the clerks' contract, and stated that the relief sought by the telegraphers "would abrogate the agreement negotiated between the carrier and the Clerks' Organization . . . ."

of the clerks to the job in question, and the fact that clerks were currently performing the job, were considered by the Board. As to usage, the Board itself observed, with respect to a different aspect of its award, that "there is unanimity upon the proposition that where, as here, the Scope Rule lists positions instead of delineating work, it is necessary to look to practice and custom to determine the work which is exclusively reserved by the Scope Rule to persons covered by the Agreement."

The Board's analysis of the substance of the dispute shows its central awareness of the clerks' claim to the jobs. The machines involved in this case are IBM teletype printers and receivers. They perform automatically the function of transmitting and receiving teletype messages between on-line railroad offices. The Board found that prior to the installation of these machines, telegraphers had exclusively performed this transmitting and receiving function as teletype operators and printer operators. However, apparently for its own convenience, since other machines in its IBM–complex were operated by clerks, the railroad unilaterally assigned the operation of the teletype printers and receivers to members of the clerks' union. The Board found that the work involved in operating the new machines had "been performed in the past by telegraphers and not by clerks."

Furthermore, even if the majority and concurring opinions were correct in stating that the Board failed to take the proper broad view of its function in construing the contract before it, the remedy, of course, would be to remand to the Board for a second proceeding to construe *this* contract. Instead, the Court remands for an entirely new proceeding to construe not only the contract brought before the Board in this case, but also the contract of a third party which has never invoked the Board's jurisdiction, which is not a party and which can be compelled to become a party only by this Court's

gloss on the statute, and in addition to apply in this new proceeding a novel substantive principle forbidding featherbedding.

Actually, the railroad's complaint is not that the Board refused to *consider* the clerks' contract, or relevant usage and practice. It is that the Board did not *decide* matters outside the issues submitted to it by the parties and the statute. And despite suggestions that *Pitney* was violated, the Court's real point—as it is respondent's— is that the Board should, in this proceeding between the telegraphers' union and the carrier, also *decide* the rights of the clerks' union—and should do so by awarding the jobs to one union or the other.

The Court also refers to *Slocum* v. *Delaware, L. & W. R. Co.,* 339 U. S. 239 (1950). This case is of no assistance whatever. The railroad filed an action in a state court for a declaratory judgment as to which of two unions was entitled under its contract with the railroad to have its members perform disputed jobs. Both unions were joined as defendants. This Court again held that the courts should not interpret the unions' contracts because this question is for determination by the Adjustment Board, "a congressionally designated agency peculiarly competent in this field." 339 U. S., at 244.

There is no doubt of the soundness of either *Pitney* or *Slocum.* The Railroad Adjustment Board does have exclusive, primary jurisdiction to determine contract disputes between a union and a carrier. And the Board must do so in light of "evidence as to usage, practice and custom" and of allegedly overlapping contracts with other unions. But the Board's authority is specific and limited. The Railway Labor Act narrowly defines the Adjustment Board's power. The Board [2] hears a dispute

---

[2] Actually, the Board functions in divisions, each responsible for a specified group of trades within the railroad world. § 3 First (h).

(a) "between an employee or group of employees and a carrier or carriers," (b) "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions," (c) if the dispute is referred to it "by petition of the parties or by either party." It renders "awards," which are "final and binding upon both parties to the dispute." [3] That is the sum total of powers over disputes vested in the Railroad Adjustment Board.[4]

The Railroad Adjustment Board is quite a different agency from the National Labor Relations Board, from whose somewhat analogous role in other industries the Court appears to derive some comfort.[5] The NLRB has broad jurisdiction over "unfair labor practices." Section 10 (k) of the National Labor Relations Act (49 Stat. 453, as amended, 61 Stat. 146, 29 U. S. C. § 160 (k)) provides that whenever it is charged that any person has engaged in the unfair labor practice of a strike to enforce a union's demand in a jurisdictional controversy with another union, the NLRB is "empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have

[3] Sections 3 First (i), (m) as amended by the Act of June 20, 1966 (80 Stat. 208). Prior to this amendment "money awards" were excluded from the scope of the quoted language.

[4] There are a few minor exceptions not relevant here. For example, the Board can interpret its own awards. § 3 First (m).

[5] In *Whitehouse* v. *Illinois Cent. R. Co.*, 349 U. S. 366 (1955), this Court cautioned against analogies drawn from other industries to railroad problems: "Both its history and the interests it governs show the Railway Labor Act to be unique. 'The railroad world is like a state within a state. Its population of some three million, if we include the families of workers, has its own customs and its own vocabulary, and lives according to rules of its own making.' Garrison, The National Railroad Adjustment Board: A Unique Administrative Agency, 46 Yale L. J. 567, 568–569." 349 U. S., at 371.

arisen." Under this section, this Court has in the past required the NLRB to take action of the kind which, in the present case, it for the first time requires of the Railroad Adjustment Board. The Court has held that the NLRB cannot obtain enforcement of a cease-and-desist order which determines only that the respondent union is not entitled to the work in dispute under its certification or collective bargaining agreement. The Court required that the Board go further and decide which of the two contending unions is entitled to the work and "then specifically to award such tasks in accordance with its decision." *Labor Board* v. *Radio Engineers,* 364 U. S. 573, 586 (1961).[6] The difficulty, however, is that § 10 (k) has no counterpart in the Railway Labor Act. No such power exists in the Railroad Adjustment Board, nor does the statute impose any comparable duty upon it.

The Board is essentially a permanent bilateral arbitration institution created by statute for settling disputes arising in the context of an established contractual relationship.[7] Its nature is illustrated by the provisions of the Act relating to awards made by the Board. These are couched in terms which assume a grievance or claim asserted by an employee or a union against a carrier. The

---

[6] But cf. *Carey* v. *Westinghouse Corp.,* 375 U. S. 261 (1964), in which the Court held that a union could obtain a court order to compel arbitration of a similar type of dispute, under an arbitration provision of a collective bargaining agreement between itself and the employer, despite the fact that the arbitration proceeding would not bind the other contending union.

[7] The Board has no jurisdiction over so-called "major" disputes which are outside the collective bargaining contract framework—for example, a dispute as to whether the contract should be changed. See *Elgin, J. & E. R. Co.* v. *Burley,* 325 U. S. 711, 722–728 (1945), adhered to on rehearing, 327 U. S. 661 (1946). To the extent that resolution of such disputes is subjected to a legal structure, it is the National Mediation Board, not the Railroad Adjustment Board, which is the responsible federal agency under the Railway Labor Act.

provisions refer only to carriers, not to other unions. For example, § 3 First (o) states that "In case of an award . . . in favor of petitioner . . . the Board shall make an order, directed to *the carrier,* to make the award effective . . . ." (Italics added.) The only provision in the Act for enforcement of awards is cast in terms of the carrier: "If a *carrier* does not comply with an order . . . ." § 3 First (p). (Italics added.) Nowhere in the Act is there a syllable which would indicate the intention that the Board is empowered to make awards as between the claims of contending unions. The Act is as clear as can be that the Adjustment Board's function is to act in disputes between a carrier and a union or employee, to adjudicate grievances of employees or their organizations against the carriers, and to pass upon controversies as to the meaning of the collective bargaining agreement between a carrier and a union.[8] The Board is not comparable in scope, function, capability or authority to the National Labor Relations Board.[9] It has no authority over "unfair labor practices" in general. It has no power comparable to that given the NLRB by

---

[8] The Board, with its peculiar bipartisan, private composition, §§ 3 First (a)–(h), is perhaps suited to this task, but one might question whether it would be appropriate for a larger role. For instance, since each division of the Board is composed of an equal number of railroad union and carrier representatives, and makes awards by majority vote, if the union representatives on the division were split—if, for example, either union had a representative on the division who disagreed with the other union representatives on the merits of the dispute—the carrier representatives would then have controlling voting power and could in effect allocate the work to whichever union they chose.

[9] The two Boards are utterly different. Some of the differences are adverted to in the text, and others are suggested by nn. 7 and 8, *supra.* The essential difference is between a permanent institutionalized arbitrator for settling disputes arising from a contractual relationship, and an administrative agency established to implement various defined public policies specified by Congress.

§ 10 (k) of the National Labor Relations Act to "hear and determine" jurisdictional disputes; it may make a decision affecting a jurisdictional dispute, but only if it comes to the Board in the limited and constricted form of a dispute between a union and a carrier as to the meaning and application of their agreement.

The Act does not give the Board power to compel a union which is affected by a contract dispute between another union and a carrier to participate in or be bound by the proceeding. This is "[o]ne thing [that] is unquestioned" according to the opinion of this Court in *Whitehouse* v. *Illinois Cent. R. Co.*, 349 U. S. 366, 372 (1955).[10] In that case, a dispute had arisen between the telegraphers and the respondent railroad because the railroad employed members of the clerks' union for jobs which the telegraphers claimed should have been allotted to its members under its collective bargaining agreement with the railroad. In due course, the telegraphers submitted the dispute to the Railroad Adjustment Board. Before a decision was announced by the Board, the railroad brought an action in the United States District Court to compel the Board to notify the clerks, asserting that otherwise the railroad might have to face a similar claim from the clerks. This Court held that the action was premature; but it pointed out that "One thing is unquestioned. Were notice given to Clerks they could be indifferent to it; they would be within their legal rights to refuse to participate in the present proceeding." 349 U. S., at 372. It said, flatly, that "The Board has jurisdiction over the only necessary parties to the proceeding [*i. e.*, the telegraphers' union] and over the subject matter." *Id.*, at 373. In substance, the Court in the present case repudiates *Whitehouse* for

---

[10] I suppose that if this Court says that the Board has power to subject another union to the proceedings, that would end the matter. But the effectiveness of our *ipse dixit* would not justify it.

reasons, not of law, but of assumed practical administrative symmetry and its own conceptions as to what is fair in a complex industrial situation. Labor relations are not susceptible of reduction to such simplicities; and with all deference this Court should fear to tread this path.

This is much more than a procedural matter. It is even more than whether the clerks can be subjected to a proceeding to which they assert they are strangers and to which Congress did not intend that they be subjected. The Court today rules that whatever the collective bargaining agreements provide—regardless of their provisions, and of the understanding of the parties—the Board must award the disputed work to one union or the other, and that it cannot provide a remedy to members of both, even if their contracts should so demand.

This may sound eminently reasonable at first hearing. But it may be both unfair and highly disruptive. Certainly, there is not a line, a word, in the Railway Labor Act which supports it. Let us suppose, for example, in the present situation that each IBM machine required one operator, and that the machine and the one operator performed both clerical and telegraphic services, displacing a telegrapher and a clerk. I know of absolutely no warrant for the Court's statement that the Board must "settle the entire dispute" by determining "which union has the right to the job" even if "both unions . . . under their separate agreements, have the right to perform the new job. . . ." On the contrary, regardless of what the clerks' contract provides,[11] if the telegraphers' contract also establishes *their* right to the job—which is entirely conceivable—the telegraphers are entitled to compensation. It is entirely possible that since the Board, as I

---

[11] Of course, the clerks' contract may be relevant to construction of the telegraphers' contract, under the *Pitney* case.

have discussed, is limited to construing and applying the agreements between each union and the carrier, it may indeed find that it has to require payment to members of one union for jobs actually performed by members of the other union. In that event, a sensible remedy would have to await negotiation between the union or unions and the carrier to eliminate the overlap and featherbedding.[12] But I repeat—the Board's task is to construe and apply the agreements, not to rewrite them, even to eliminate overlaps and duplications; nor is it the function of this Court to add new powers to those vested in the Board by Congress, or to impose upon the intricate and technical contracts of railway labor a new and unauthorized substantive principle.

I would reverse and remand for further proceedings in the District Court, consistent with the views expressed herein, with respect to the telegraphers' prayer for enforcement of the Board's award.

---

[12] Under the Railway Labor Act, such contractual renegotiation would be a "major" dispute, subject to the jurisdiction of the Mediation Board, not the Adjustment Board. See n. 7, *supra.* See also *Telegraphers* v. *Chicago & N. W. R. Co.,* 362 U. S. 330 (1960), where the Court upheld the telegraphers' right to strike to compel bargaining on a proposed contract change which would have prevented the railroad from abolishing any position in existence before a certain date. The Court held this was a "major dispute" covering a legitimate subject of collective bargaining within the contemplation of the Railway Labor Act, and therefore within the anti-injunction provisions of §§ 4, 8 and 13 (c) of the Norris-LaGuardia Act, 47 Stat. 70, 72, .73 (1932), 29 U. S. C. §§ 104, 108, 113 (c). It rejected the railroad's argument that the union's demand did not create a legitimate "labor dispute" within Norris-LaGuardia because it sought to perpetuate "wasteful" and "unnecessary" jobs.