**BROTHERHOOD OF RAILROAD SIG-NALMEN OF AMERICA, Appellant,**

v.

**SOUTHERN RAILWAY COMPANY, a corporation, Appellee (two cases).**

**BROTHERHOOD OF RAILROAD SIG-NALMEN OF AMERICA, Appellee,**

v.

**SOUTHERN RAILWAY COMPANY, a corporation, Appellant (two cases).**

**Nos. 10799–10802.**

United States Court of Appeals Fourth Circuit.

Argued Jan. 12, 1967.

Decided May 1, 1967.

Rehearing Denied June 9, 1967.
Certiorari Denied Nov. 13, 1967.

See 88 S.Ct. 324.

---

* Honorable Carl A. Weinman, Chief Judge, United States District Court for the Southern District of Ohio, sitting by designation.

Harold C. Heiss, Cleveland, Ohio (Charles T. Boyd, Greensboro, N. C., Donald W. Bennett, Cleveland, Ohio, York, Boyd & Flynn, Greensboro, N. C., and Heiss, Day & Bennett, Cleveland, Ohio, on brief), for Brotherhood of Railroad Signalmen of America.

C. T. Leonard, Jr., Greensboro, N. C. (L. P. McLendon, Jr., Greensboro, N. C., James I. Hardy, Washington, D. C., and

McLendon, Brim, Holderness & Brooks, Greensboro, N. C., on brief), for Southern Ry. Co.

Before SOBELOFF and BOREMAN, Circuit Judges, and KAUFMAN, District Judge.

SOBELOFF, Circuit Judge:

The Brotherhood of Railroad Signalmen (hereinafter Brotherhood) appeals from the District Court's refusal to enforce in full two awards of the National Railroad Adjustment Board based upon alleged breaches by Southern Railway Company of the collective bargaining agreement in force between the parties. The sums directly involved are small, but intriguing and possibly far reaching questions are raised as to the Board's procedure and the scope of the courts' reviewing authority.[1]

Award No. 11733 (appeal No. 10,799) stems from Southern's unilateral contracting out of work incident to the installation of three replacement poles for an electrical transmission line at High Point, North Carolina. The existing transmission line needed to be raised to permit construction of a new spur track, and this necessitated the installation of taller poles on which to string the line. Southern's position before the Board was that its supervisor received only three days advance notice of the scheduled commencement of the construction, which would require elevation of the line before that date. It asserted that neither an electrical workers' line gang nor a signal gang was available—one or the other of which would ordinarily perform the work —and that it therefore arranged for the vendor of the new poles also to supply the necessary men and machinery and to perform the actual installation.[2] Southern's

---

1. Compensation in the amount of $92.79 was awarded in No. 10,801, while less than $14.00 was awarded in No. 10,799.

2. Southern's Signal and Electrical Department is comprised of two distinct crafts, signalmen and electrical workers, both of which regularly perform the work of maintaining electrical transmission lines. The signalmen are represented for pur-

poses of collective bargaining by the Brotherhood and the electrical workers are represented by the International Brotherhood of Electrical Workers (I. B.E.W.). The current contracts negotiated by Southern with Brotherhood and with I.B.E.W. recognize that both signalmen and electrical workers have been performing line work and make provision for

argument was that, faced with an emergency, its actions did not constitute a breach of the collective bargaining agreement. Brotherhood, on the other hand, contended that a crew of its members capable of installing the poles was working at Charlotte, North Carolina, only 75 or 80 miles away, and could easily have been transferred to High Point in ample time. It does not appear whether I.B. E.W., the electrical workers' representative, was notified of the pendency of the Board proceeding. The Board sustained Brotherhood's position and held that its contract had been violated.

Award No. 12300 (appeal No. 10,801) stems from Southern's assignment of the maintenance of a newly installed electrical "car retarder system" at its Hayne Car Shop Yard near Spartanburg, South Carolina, to employees represented by a union other than Brotherhood. The purpose of the retarder system is to hold cars in place on the tracks outside the repair shop after their emergence from the paint shop, until the repairmen are ready to work on them. The system was installed by an outside contractor, and while Brotherhood initially complained that its members were entitled to both the installation and maintenance work, it

limited its formal claim to the latter, conceding that with respect to the installation it was barred by its failure to assert the claim within the 60-day contractual limitations period.

Brotherhood relied on the language of the "Scope Rule" in its contract to the effect that "[s]ignal work shall include * * * generally recognized work on * * * car retarder systems * * *." Southern's view was that maintenance of the retarders was not "generally recognized signal work" because that phrase historically refers to the more elaborate mechanisms used in large railroad yards to classify cars, and not to the equipment here involved, which it asserted was physically located entirely within the "[repair] shop limits and fall[s] within the Scope Rule of the Shop Crafts Agreement." Rejecting this argument, the Board stated that "the Rule [scope rule in Brotherhood contract] contains no language limiting or restricting 'Car Retarder Systems' with respect to their size, their location or the purpose for which they must or may be used." The Board also held that the union to which the Shop Craft employees belong, which had been notified of the pendency of the Board

both to continue doing so. The signalmen's contract provides that

"Nothing in this Scope Rule 1 or any other provision of this agreement shall be construed to bar the carrier from continuing to assign to Electrical Workers on Lines East work of the character heretofore performed by employees in the so-called IBofEW [sic] line gang on Lines East and such practice may be continued without being an infringement on the rights of employees subject to this agreement; it being agreed that the Electrical Workers in the so-called IBof EW line gang on Lines East, as well as employees covered by this agreement, have been performing both low and high tension line work."

The complementary provision in I.B.E. W.'s contract, quoted in "Carrier's Statement of Facts" before the Board, recognizes that signalmen perform similar work. The pertinent part of the statement is as follows:

"The work which they [electrical workers] have a right to perform is de-

scribed in Rules 136 and 137 of that agreement [I.B.E.W. Contract], which, among other things, provides in Rule 137 that:

'Linemen's work shall consist of the building, repairing and maintaining of pole lines and supports for service wires and cables; * * *.

Signal maintainers who, for fifty percent or more of their time, perform work as defined in Rules 136 and 137.'

Signal employees perform work of the character described in Scope Rule 1 of their agreement and, in addition, are permitted to perform electrical work within the limits prescribed in the second paragraph of Rule 137 of the Electrical Workers' agreement (quoted next above), which includes the building, repairing, and maintaining of pole lines and supports for service wires and cables; '* * * other work properly recognized as linemen's work.' "

proceedings but chose not to appear, was not a necessary party to the dispute.[3]

By the terms of both awards (Nos. 11733 and 12300, our appeals 10,799 and 10,801), Southern was ordered to compensate certain members of the complaining Brotherhood in the amount that would have been earned had the members been permitted to install the transmission line poles and maintain the retarders from the date of installation. The railroad was further ordered to restore to signalmen the maintenance work incident to operation of the retarders. Upon Southern's refusal to comply with the awards, the Brotherhood instituted enforcement proceedings in the District Court under section 3, First (p) of the Railway Labor Act, 45 U.S.C.A. § 153, First (p) (1954).

The District Court agreed that the railroad violated the contract in both instances, but declined to enforce the awards of damages as determined by the Board, and limited the allowance to nom-

inal damages of $1.00 in each case. The court reasoned that since the employees designated by Brotherhood to receive the monetary awards had been fully employed at all relevant times, they were not entitled to any remuneration for lost work. In the exercise of its authority under section 3, First (p) of the Act, the court awarded Brotherhood legal fees of $25.00 in each case.[4] On appeal to this court, Brotherhood contends that the monetary awards should have been enforced in full and that the allowance of only $25.00 counsel fees in each case was inadequate and unreasonable.[5]

On June 20, 1966, twelve days after the District Court entered judgments in these cases, there became effective certain amendments to the Railway Labor Act restating and further restricting the scope of judicial review of Board awards.[6] Brotherhood urges the applicability of these amendments to pending appeals, but the view we take of the cases makes it unnecessary to resolve this question.[7]

---

3. Apparently, the notice and response thereto were in a form antedating the Supreme Court's decision in Transportation-Communication Employees Union v. Union Pacific R. R., 385 U.S. 157, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966), and adverted to therein. Id. at 159 n. 2, 87 S.Ct. 369. The response specifically reserved the right of the non-petitioning Shop Craft employees' union to institute separate proceedings if the Board's decision adversely affected its members' jobs.

4. Section 3, First (p), 45 U.S.C.A. § 153, First (p) (1954), provides that "[i]f the petitioner shall finally prevail he shall be allowed a reasonable attorney's fee * * *."

5. Southern filed two cross-appeals, Nos. 10,800 and 10,802, claiming that it was entitled to trials *de novo* in the District Court on the question whether it violated the collective bargaining agreement in the two cases. Before oral argument in this court, however, Southern decided not to pursue the cross-appeals. See Gunther v. San Diego & Arizona Eastern Ry., 382 U.S. 257, 86 S.Ct. 368, 15 L.Ed.2d 308 (1965).

6. Section 3, First (p) of the Act, 45 U.S. C.A. § 153, First (p) (1954), which prior to amendment read in pertinent part that a Board order "shall be prima facie evidence of the facts therein stated," was

amended to read that "the findings and order of the * * * Board shall be conclusive on the parties."

Section 3, First (m) of the Act, 45 U.S. C.A. § 153, First (m) (1954), which prior to amendment read in pertinent part that "awards shall be final and binding on both parties to the dispute, except insofar as they shall contain a money award," was amended by deletion of the words "except insofar as they shall contain a money award."

The only other amendment relevant to the present appeals was the addition to § 3, First (p) of a proviso that Board orders

"may not be set aside except for failure of the division to comply with the requirements of this Act, for failure of the order to conform, or confine itself, to matters within the scope of the division's jurisdiction, or for fraud or corruption by a member of the division making the order.

7. In Brotherhood of Railroad Trainmen v. Denver & Rio Grande Western R.R., 370 F.2d 833 (Dec. 28, 1966), the Tenth Circuit held that the amendments do apply to cases pending on appeal on June 20, 1966, and, despite their according finality to a Board award of money damages, do not infringe the Seventh Amendment right to a jury trial.

## I.

On their face, the present appeals raise solely a legal question as to the scope of judicial review of Board awards. However, we must first consider the possible effect of the Supreme Court's recent decision in Transportation-Communication Employees Union v. Union Pacific R. R., 385 U.S. 157, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966), which imposes on the Board the obligation fully to settle jurisdictional disputes in a single proceeding.[8]

In *Transportation-Communication*, the railroad installed IBM machines to perform dual functions previously assigned separately to clerks and to telegraphers. Operation of the machines was assigned to the clerks, and the telegraphers' union protested, claiming the jobs for its members. The dispute eventually reached the Board. Although the clerks' union was notified of the pendency of the case, it declined to participate, indicating an intention to institute separate proceedings if the jobs of any of its members should be threatened.[9] The Board determined that the telegraphers were entitled to operate the machines under their contract and awarded compensation to telegraphers idled by assignment of the jobs to clerks. It did not consider whether a reasonable construction of the railroad's contract with the clerks' union would support assignment of the jobs to its members. The District Court denied enforcement of the award on the ground that the clerks' union was an indispensable party and the Court of Appeals for the Tenth Circuit, and in turn the Supreme Court, affirmed. The Court reasoned that the Board's failure to bring before it all parties to the dispute amounted to an abdication of its statutory responsibility to settle the "entire dispute." It remanded the case to the Board with directions that the clerks' union once again be given the opportunity to participate

> "and, whether or not the clerks' union accepts this opportunity, to resolve this entire dispute upon consideration not only of the contract between the railroad and the telegraphers, but 'in light of * * * [contracts] between the railroad' and any other union 'involved' in the overall dispute, and upon consideration of 'evidence as to usage, practice and custom' pertinent to all these agreements." 385 U.S. at 165–166, 87 S.Ct. at 374 (Citation omitted.) [10]

Although the jurisdictional disputes in *Transportation-Communication* and in appeal No. 10,801 are in some respects distinguishable, we think that the same underlying policy considerations are found in both. The installation of IBM machines in *Transportation-Communication* eliminated two existing jobs and created a new one incorporating the functions of both, yet different from each. The question of the operation of the new machines was not foreseen and was therefore not covered by any express language in the contract with either union. Viewing the function of the machines, each craft had a tenable claim to their operation based upon the general scope of its contract with the railroad. In appeal No. 10,801, however, the car retarders eliminated no jobs and the Board indicated that additional work was created of a type similar to, if not functionally identical with, that traditionally performed by signalmen. While Southern insisted that retarders do not serve the same purpose

---

8. *Transportation-Communication* was decided after the District Court rendered its decisions in these cases and after briefs were filed in our court. Although the decision was available shortly before oral argument of the appeals, it was not alluded to by counsel for either side. We consider it unnecessary, however, further to delay our decision by requesting a rehearing on the limited question of its applicability to these cases.

9. See footnote 3, supra.

10. It is noteworthy that in the future a competing union will be more likely to enter an appearance, for it will undoubtedly be precluded from instituting separate proceedings once the "entire dispute" has been finally settled.

in a repair yard as in a classification yard, the Board noted that the scope rule of the Brotherhood contract admits of no such distinction. The internal structure and functioning of the retarders is the same whether they stop and hold cars in place in the repair yard, or merely retard their movement in a classification yard.

The factual variance between *Transportation-Communication* and appeal No. 10,801 might arguably call into play the distinction to which the Court adverted in *Transportation-Communication* between the creation of a totally new job and

> "[t]he ordinary jurisdictional dispute [which] arises when two or more unions claim the right to perform a job which existed at the time the collective contract with the employer was made. In such a situation it would be highly unlikely that each contract could be construed as giving each union the right to be paid for the single job." 385 U.S. at 161, 87 S.Ct. at 371.

The point is not free from doubt. On balance, we are more disposed to the view that the installation of car retarders in the repair shop yard may present a sufficiently novel set of circumstances to warrant application of the rule in *Transportation-Communication*. True, the IBM machines were an innovation, while car retarders have long been in use. Yet it is not implausible that the retarders may have replaced some older, mechanical device operated by repair shop employees to hold the cars in position. There may be other relevant circumstances not apparent to judges, yet not spelled out in the record because they are so well known to the Board and others familiar with the industry practices. It is precisely this uncertainty as to the preexisting factual context that suggests the desirability of applying *Transportation-Communication,* which had not been decided when No. 10,801 was before the Board.

■ The record before us, containing only scant reference to the existence of a competing union and referring not at all to its contract, fails to provide an adequate basis for resolution of the "entire dispute." This court cannot with confidence perform its limited reviewing function when it does not clearly appear in the record whether the Board considered the contract of the competing union.[11] The Supreme Court in *Transportation-Communication* has made known its view that that union's failure to complain will not be deemed sufficient reason for disregarding its contract.

■ We do not, however, intimate that on remand the Board's decision must be other than it was. We hold only that until the record discloses whether the Board has taken into account the competing union's contract, it cannot be said that the mandate of *Transportation-Communication* has been complied with.

■ We are further of the opinion that appeal No. 10,799 also is governed by the rule of *Transportation-Communication*. As noted above, work of the type contracted out was negotiated into the agreements of both Brotherhood and I.B.E.W., but, because of the latter's failure to complain, the Board expressly refrained from deciding whether, in a dispute between the two unions, I.B.E.W. would be entitled to the work. The Board stated that:

> "These arguments [of Southern that it had not violated Brotherhood's agreement because work of the type contracted out did not belong exclusively to Brotherhood] in our estimation, would have more validity if Management had actually assigned the task in question to Carrier-employed Electricians rather than to outsiders. Assuming that, pursuant to the two applicable agreements and past practice, the work had been given to Electricians, there might well be grounds for arguing that the Signalmen's Agreement had not been abridged. But this is not the situation confronting us. Here, the work was not given to employees of

---

11. But see Transportation-Communication, 385 U.S. at 173–174, 87 S.Ct. 369 (Fortas, J., dissenting).

either group who might have laid claim to it. While no complaint was filed by the Electricians, the Signalmen did protest. There is good reason, therefore, to uphold their claim."

This language indicates that the Board, itself, recognized an uncertainty as to which union could assert a right to perform the disputed work or whether, by virtue of the collective agreements and past practice, Southern could unilaterally assign the work to either union, but not to an outsider. It is, of course, possible that on account of a contractual limitations period, I.B.E.W.'s failure to complain precludes it from now asserting a claim to the work. This, however, can be determined only on remand.[12]

We do not read *Transportation-Communication* as limited to instances where a totally new job is created that combines the functions of two existing, independent jobs—a development unforeseen when the collective agreements were negotiated. The aim of that decision is to avoid the dilemma which Justice Black points out may arise when an adjudication is made affecting a party not present and whose rights are not considered. The dilemma is not avoided—indeed, the risk of its arising is heightened—when, as in appeal No. 10,799, the disputed work is negotiated into the contracts of two competing unions. Similarly, it seems to make little difference whether the job is characterized as "new" or "old" or whether it entails continuing work or only the performance of an isolated task.[13] While the unusual facts of *Transportation-Communication* on their face suggest that both telegraphers and clerks had a possible claim to be paid for operation of the machines, on the state of the records before us we cannot say that

---

12. In *Transportation-Communication*, the Board's award decided only that the telegraphers were entitled to be paid for the job, and did not require that they actually be allowed to perform it. It is thus difficult to imagine how the clerks could have been prejudiced since, if they continue to operate the machines, they certainly would be paid. Presumably, however, the railroad, not wishing to support idle telegraphers, might reassign operation of the machines to them, and the clerks would have a legitimate grievance. The clerks' union might then institute separate proceedings before the Board, which, upon consideration of its contract, might award its members compensation and/or the job. If the railroad then refused to pay the telegraphers, claiming that it should not be required to pay two employees to perform a single job, further proceedings might be required to resolve the "entire dispute."

In No. 10,801, the award not only ordered compensation to the signalmen, but also required restoration of the maintenance work to them. The situation is thus different from that in *Transportation-Communication*. However, if Southern now refuses to pay Shop Craft employees for this work, the same type of "merry-go-round," 385 U.S. at 162, 87 S.Ct. 369, 17 L.Ed.2d 264, envisioned in *Transportation-Communication* will ensue. Not until the claims of all competing unions are considered can the "entire dispute" be finally resolved, for only then are the non-participating unions bound as if they "had lost in a multilateral *in rem* proceeding." 385 U.S. at 168, 87 S.Ct. at 375 (Stewart, J., concurring).

In No. 10,799, the dispute involved only the performance of an isolated job, not the assignment of continuing work. There was thus no reason for the award to look to the future. However, it is not unlikely that I.B.E.W., which has until now remained silent, will decide that if, as the Board held, Southern had no right to contract out the installation job, I.B.E.W. members should be compensated for that work. Once again, additional proceedings may be required before the "entire dispute" can be resolved.

13. In both appeals there may be industry practices concerning the sharing of work between competing unions or suggesting other accommodations. We note the discussions, seemingly in conflict, in the majority and dissenting opinions of Justices Black and Fortas in *Transportation-Communication* with respect to the possibility that each competing union may be entitled to compensation for the disputed work, 385 U.S. at 161–162, 180–181, 87 S.Ct. 369. However, the records in both cases furnish insufficient facts to enable this court to determine whether any such issue exists, and if it does exist, within what latitude it should be met by the Board. On remand, the Board should accordingly amplify the records so that, if required, an informed judgment may be made.

either of the instant appeals presents a qualitatively different set of circumstances militating against the application of *Transportation-Communication.*

## II.

■ Since the cases must be remanded to the Board, we are not in position to foresee whether the ultimate awards will be in Brotherhood's favor. If, however, after full consideration of all relevant materials, as required by this opinion, Brotherhood prevails and the matter again comes before the District Court for enforcement, we are of the opinion that the monetary portions of the awards, as well as the Board's determinations on the merits, must be enforced.

The reasoning of the Supreme Court in Gunther v. San Diego & Arizona Eastern Ry., 382 U.S. 257, 86 S.Ct. 368, 15 L.Ed.2d 308 (1965), decided prior to the enactment of the recent amendments,[14] furnishes the controlling guidelines. There the union sought enforcement of a Board award directing reinstatement with back pay of a discharged employee. The District Court and the Court of Appeals denied enforcement, relying on their own interpretation of the provisions of the collective bargaining agreement. Reversing, the Supreme Court held that "Congress intended minor grievances of railroad workers to be decided finally by the Railroad Adjustment Board," 382 U.S. at 263, 86 S.Ct. at 372, and that "it cannot be said that the Board's interpretation [of the collective bargaining agreement] was wholly baseless and completely without reason." Id. at 261, 86 S.Ct. at 371. Turning to the monetary portion of the award, the Court ruled that district courts "may determine * * * how much time has been lost by reason of the wrongful removal * * *" and compute "the size of the * * * award." Id. at 264, 86 S.Ct. at 372.

■ Courts have uniformly held that *Gunther* precludes judicial reexamination of the merits of a Board award.[15] Thus, beyond question, it is not within our province, or that of the District Court, to reappraise the record and determine independently whether Southern violated its obligations under the collective bargaining agreement when it denied Brotherhood members the opportunity to perform the work in question. Southern insists, however, that with respect to the monetary portions of the awards, the District Court acted not in conflict with *Gunther* in limiting Brotherhood to nominal damages on its findings that the records in both cases contain "no evidence of any loss of time, work or pay" by any of the employees who were designated to receive compensation for the lost work. In accepting this contention of Southern, the District Court relied on the common law rule that damages recoverable for breach of an employment contract are limited to compensation for lost earnings. The court reasoned that since *Gunther* permits judicial computation of the size of the monetary awards, it could exercise a discretion to allow Brotherhood nominal damages only where its members lost no time.

This approach, however, completely ignores the loss of opportunities for earnings resulting from the contracting out of work allocated by agreement to Brotherhood members—a deprivation amounting to a tangible loss of work and pay for which the Board is not precluded from granting compensation. Nothing in the record establishes the unavailability of signalmen to perform the work contracted out by the railroad. The vast number of factual possibilities which arise in the field of labor relations, and which must be considered by the Board

---

14. See note 6, supra, and accompanying text.

15. E. g., Hanson v. Chesapeake & Ohio Ry., 367 F.2d 134 (4th Cir. 1966); Hodges v. Atlantic Coast Line R. R., 363 F.2d 534 (5th Cir. 1966); Taylor v. Hudson Rapid Tubes Corp., 362 F.2d 748 (3d Cir. 1966); Edwards v. St. Louis-San Francisco Ry., 361 F.2d 946 (7th Cir. 1966); Barrett v. Manufacturers Ry. Co., 254 F.Supp. 376 (E.D.Mo.1966).

in cases of this kind, clearly reflects the wisdom of the *Gunther* rule.

The practical effect of the District Court's refusal to enforce the monetary portions of the awards is to undermine and, in essence, reverse the Board's resolution of the merits of the controversies. The unequivocal holding of *Gunther* is that courts have no role to perform in determining whether the Act has been violated. The District Court partially recognized the force of this principle by enforcing the awards insofar as they held Southern to have breached the agreement. Yet, if, whenever no direct lay-off of a union's members is involved, the employer can unilaterally contract out work that has been allocated by agreement to the union, under no greater threat than liability for merely nominal damages, the collective agreement would soon become a worthless scrap of paper. It requires but slight insight into the realities of human behavior to realize that neither party would feel bound to abide by an agreement that will not be effectively enforced in the courts.

We cannot disregard the Supreme Court's animadversion expressed in *Gunther* against "[p]aying strict attention only to the bare words of the contract and invoking old common-law rules for the interpretation of private employment contracts * * *." 382 U.S. at 261, 86 S.Ct. at 371. Were we to approve the District Court's resort to common-law principles governing breach of contract damages, we would be derelict in our unquestionable duty fully to enforce the Board's determination on the merits. The Supreme Court, in another context, has only recently strongly reiterated that "[a] collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it to be governed by the same old common-law concepts which control such private contracts." *Transportation-Communication*, supra 385 U.S. at 160–161, 87 S.Ct. at 371.

We have dealt at great length in parts I and II of this opinion on the impact of *Transportation-Communication* and the implications in *Gunther* for our obligation to defer to Board expertise. We have done so because in our view the Supreme Court's ruling that "minor" disputes should be entirely resolved in a single Board proceeding stems, at least in part, from its insistence, emphasized in *Gunther*, that the Board is the final arbiter of such disputes. Being final, it may render decision only after thorough consideration of all relevant collective agreements and industry practices. Together, *Gunther* and *Transportation-Communication* reflect a single overarching theme—that final and binding awards are to be made by industry experts upon full information, subject to a minimum of judicial intervention.

### III.

As to Brotherhood's complaint that in allowing attorneys' fees of only $25.00 in each case the District Court abused its discretion, it is fair to the District Court to note that it requested Brotherhood to submit authorities bearing on the criteria for determining the size of attorneys' fees in this type of case. When no enlightenment was forthcoming, the court set the fees at a nominal $25.00, based upon the fact that the claim directly involved was less than $14.00 in No. 10,799 and only $92.79 in No. 10,801.

We think, however, that the court erred in limiting its consideration solely to the sum involved in the instant awards. If Brotherhood prevails on remand and Southern again refuses to comply, necessitating further enforcement proceedings, the court must undertake a more extensive inquiry before awarding fees.

It scarcely requires mention that the significance of a legal precedent is not confined by the amount of money immediately in issue. A party seeking judicial enforcement of a Board award is entitled to a reasonable compensation for its attorneys. Here a union has been endeavoring to preserve the integrity of its members' earning opportunities in the performance of work claimed to be allocated to them. If it ultimately succeeds in this effort it should be awarded rea-

sonable fees according to accepted professional standards. Despite the small sum immediately recoverable, the case is important to the parties and they are warranted in making reasonable expenditures in prosecuting or defending.

In determining reasonable attorneys' fees, factors to be taken into account are the importance and complexity of the issue being litigated, the quality of the legal services, and the time required for preparation and court appearances. The standards employed in compensating attorneys for the opposing party in litigating the selfsame issue give some indication of the importance of the case and are a relevant consideration in fixing the fees. This list is not meant to be exhaustive and in any future application for fees, the District Court may consider all factors which its experience suggests as pertinent.

For the reasons stated, the judgments of the District Court are vacated and the cases are remanded with directions that they be returned to the Board for further proceedings consistent with this opinion.

Reversed and remanded with instructions.

On Petition for Rehearing

PER CURIAM:

The court is of the opinion that the petition for rehearing should be denied. While Petitioner's contention that the original awards fully resolved the disputes may have merit, the National Railroad Adjustment Board is the appropriate forum in which the Petitioner should seek clarification of the awards. The Board should have the opportunity to reconsider and amplify the awards in light of Transportation-Communication Employees Union v. Union Pacific R. R., 385 U.S. 157, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966), which was not decided when the awards were made.

If the Petitioner prevails on remand to the Board, it will be entitled to enforcement in the District Court in respect to recovery of reasonable attorneys' fees, whether or not the carrier voluntarily complies with the remainder of the awards. Despite fears voiced by the Petitioner, its claims to reasonable attorneys' fees will thus be preserved.

Rehearing denied.