In the
United States Court of Appeals
For the Seventh Circuit

No. 01-1501

Gerald Sprague,

Plaintiff-Appellant,

v.

Central States, Southeast and Southwest Areas
Pension Fund, an employee pension benefit
plan, and Ray Cash, Joe Orrie, Jerry Younger,
George J. Westley, Howard McDougall, and
Arthur H. Bunte, Jr., Individually, and as
Trustees of Central States, Southeast and
Southwest Areas Pension Fund, and
United Parcel Service, INC., an Ohio
corporation,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99-C-7726--James B. Moran, Judge.

Argued September 14, 2001--Decided October 18, 2001


Before Flaum, Chief Judge, and Manion and
Williams, Circuit Judges.

Flaum, Chief Judge.  Gerald Sprague, a
participant in the Central States,
Southeast and Southwest Areas Pension
Fund ("the Fund"), brought suit in the
Northern District of Illinois, alleging
that defendants violated the Employee
Retirement Income Security Act ("ERISA")
when they entered into an arrangement
whereby UPS would agree to remain an
employer-member of the Fund for a new
five-year term, but would not contribute
for the first five months of the term.
Sprague, a non-UPS participant, claimed
that the Fund and its trustees
(collectively "Central States") violated
29 U.S.C. sec. 1104(a)(1)(D) (ERISA sec.
404(a)(1)(D)), and that Central States
and UPS violated 29 U.S.C. sec.sec.
1106(a)(1)(B) and (D) (ERISA sec. 406
(a)(1)(B) and (D)). Central States and
UPS each filed motions for summary
judgment claiming that the arrangement
was lawful and no ERISA violations
occurred. The district court granted both

motions, holding that because UPS never had an obligation to contribute during the five-month period, no genuine issue of material fact existed as to Sprague's claims. Sprague appeals. For the reasons stated herein, we affirm.

## I. Background

The Fund is a pension plan with multiple employer-members, including UPS. It exists via a trust agreement between the trustees, the employers, and local unions affiliated with the International Brotherhood of Teamsters ("IBT"). For many years prior to August 1, 1997, UPS had been the largest employer-member of the Fund; its employees comprised 18% of the Fund's participants and, in the prior year, UPS contributed 22% of the Fund's total contributions. On July 31, 1997, the then-current five-year collective bargaining agreement between UPS and IBT was due to expire. From May through August 1997, the parties negotiated a new five-year agreement. The negotiations did not go smoothly. In May, UPS informed IBT that it was considering withdrawing from the Fund and establishing its own national pension program. Because UPS was such a large contributor and because its employees constituted such a large and demographically favorable percentage of the Fund's active participants, Central States grew concerned about the effect such a withdrawal would have on the financial soundness of the plan. It hired Millman & Robertson, an actuarial firm, to analyze the impact of the proposed withdrawal. The firm's report indicated that UPS's withdrawal would harm the Fund's actuarial health in several ways: the period for amortizing actuarial liabilities would be extended, the Fund's ability to meet ERISA's minimum funding requirements would be threatened, and the Fund's ability to cushion itself from market fluctuations would be restricted.

The central disagreement throughout the negotiations was the amount of UPS's contributions to the Fund. On July 22, 1997, UPS made a last and best offer and again warned that it was prepared to withdraw from the Fund altogether. IBT refused the offer and authorized a nationwide strike. During the strike, both parties looked for ways to come to an agreement. Ronald Kubalanza, the Fund's executive director, and Ray Cash, a trustee, along with the actuarial team,

developed the plan that, in its final form, is the source of this dispute: UPS would remain a member of the Fund and enter into a new five-year agreement with IBT, with contribution rates higher than those in the previous five-year term. In exchange, UPS's contribution obligations would be abated from August 1, 1997 through December 31, 1997. The actuaries at Millman & Robertson concluded that the Fund's financial health would be significantly better with UPS as a member under the abatement plan than without UPS as a member at all. IBT agreed to the plan and proposed it to David Murray, UPS's chief negotiator. On August 18, 1997, Kubalanza faxed a letter confirming the agreement to Murray, and faxed a copy to Ken Hall, IBT's chief negotiator ("Kubalanza letter").

The terms of the abatement plan were as follows: in exchange for UPS's agreement to participate in the Fund for a new five-year term, Central States agreed that (1) UPS shall cease contributing to the Fund from August 1, 1997 through December 31, 1997; (2) the Fund shall grant contributory service credit to UPS employees during this period; (3) the abatement will not constitute withdrawal from the Fund; (4) UPS shall be deemed to have contributed during this period; (5) UPS shall recommence contributing on January 1, 1998; and (6) the plan is dependent on UPS entering into a new five-year agreement with IBT. Later on August 18, UPS and IBT announced that they had reached a satisfactory deal and that the strike had ended. The next day, the Fund received a summary of the Tentative National Master UPS Agreement for 1997-2002 ("tentative CBA"). In discussing the summary, the trustees of the Fund agreed to the increased contribution rates and agreed, orally and in writing (in the "letter of agreement"), that the CBA was contingent upon the abatement plan. When the CBA was still tentative, Central States distributed a newsletter describing the nature of the CBA and the abatement plan. In early 1998, UPS employees ratified the new CBA which included the Teamsters Central Regional UPS Supplemental Agreement ("Central Supplement"). Neither the master CBA nor the supplement expressly mentions the abatement plan; both documents address UPS's overall contribution rate for multi-employer plans,

and do not distinguish the unique Central States abatement agreement. Since ratification, the Fund has provided service credit to UPS employees, and UPS has contributed pursuant to the abatement plan. UPS never paid and the Fund never requested contribution for the period of August 1, 1997 through December 31, 1997.

II.  Discussion

We review the district court's grant of summary judgment de novo, construing all of the facts and reasonable inferences that can be drawn from those facts in favor of the nonmoving party. See Central States, Southeast & Southwest Areas Pension Fund v. Fulkerson, 238 F.3d 891, 894 (7th Cir. 2001). A grant of summary judgment is appropriate if the pleadings, affidavits, and other supporting materials leave no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

Sprague argues that the defendants violated ERISA whether or not UPS was obligated to contribute to the Fund during the abatement period. If there was an obligation, he contends, Central States violated section 404 when it failed to collect the contributions as required by the documents governing the plan, and both Central States and UPSviolated section 406 by engaging in a transaction that constitutes a lending of money or extension of credit, or a transfer of assets to a party in interest. If no obligation existed, Sprague continues, Central States violated section 404 when it awarded service credits and retirement benefits to UPS employees during the abatement period in violation of the governing documents. Under this reasoning, if defendants have not violated one provision of ERISA, they have violated another. We cannot agree with that assessment. Because the governing documents include the letters setting forth the abatement plan, no section 404 violation occurred. Furthermore, since UPS was under no obligation to contribute to the Fund during the abatement period, no section 406 violation occurred. Summary judgment was appropriate on each claim.

A.  ERISA sec. 404(a)(1)(D)

ERISA sec. 404(a)(1)(D) provides in relevant part that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and in accordance with the documents and instruments governing the plan. . . ." Sprague makes two claims that are mutually exclusive. First, he argues that if UPS was obligated under the governing documents to contribute to the Fund during the abatement period, then the trustees' failure to enforce that obligation violates the provision. Second, he argues that if UPS was not obligated to contribute, then the trustees' award of service credit and retirement benefits to UPS employees during the abatement period violated the provision because the Pension Fund's Plan provides that "[a] participant shall earn contributory service for any employment with a contributing employer required to make employer contributions on his behalf according to a collective bargaining agreement." Both of these claims, Sprague contends, should have been presented to a jury.

Although they hinge on different legal theories, each contention relies on a faulty premise: that the CBA and the Central Supplement constitute the entirety of the governing documents. We agree with the district court's finding that this is not so. When interpreting a collective bargaining agreement, a court must "consider the scope of other related collective bargaining agreements, as well as the practices, usage and customs pertaining to such agreement." Transportation-Communication Employees Union v. Union Pacific Railroad Co., 385 U.S. 157, 161 (1966). The Kubalanza letter and the letter of agreement, laying out the abatement plan which the parties entered into before the 1997-2002 CBA was created, are key components of the overarching agreement between UPS and IBT, and must be included within the scope of "governing documents." The Fund, UPS, and IBT all clearly intended that the abatement plan be considered in conjunction with the CBA. The terms of the abatement plan were negotiated along with the CBA. Furthermore, each of the three negotiating parties agrees that no abatement plan would exist without the new CBA and, more importantly, no new CBA

would exist without the abatement plan. See Central States, Southeast and Southwest Areas Pension Fund v. Kroger Co., 73 F.3d 727, 731-32 (7th Cir. 1996) (noting the importance of the negotiating parties' intent in defining the scope of the collective bargaining agreement); Murphy v. Keystone Steel & Wire Co., 61 F.3d 560, 567 (7th Cir. 1995) (emphasizing that when a specific plan is negotiated along with a CBA, the plan should be read together with the CBA). The abatement plan need not have been expressly incorporated into the CBA to be considered part of the overall agreement. Central States, Southeast and Southwest Areas Pension Fund v. Kroger Co. at 731.

Construing the governing documents under ERISA sec. 404(a)(1)(D) to include those that describe the abatement plan does not end our discussion, however. Two questions remain: (1) Under the governing documents, was UPS obligated to contribute during the abatement period? and (2) If not, do the governing documents require that no service credit be granted to UPS employees during the abatement period?

1.

Sprague contends that the CBA suggests, and the Central Supplement mandates, that UPS contribute to the Fund during each month of the five-year term of the CBA, including the abatement period. Article 14 of the Central Supplement states:

Effective on the dates listed below [including the abatement period], the Employer shall contribute to [the Fund] the corresponding dollar amounts for each full-time seniority employee covered by this Agreement (except as may be modified by an approved Local Union Rider).

By ignoring this provision, Sprague argues, the trustees have breached their fiduciary duties under ERISA sec. 404(a)(1)(D), which requires them to discharge their duties in accordance with the governing documents. When we consider the governing documents as a whole, however, as the district court did, it is clear that the trustees have not violated the provision. As discussed above, the Kubalanza letter and letter of agreement state that "[UPS] shall temporarily cease

contributing to the Pension Fund during the period August 1, 1997 to and including December 31, 1997." IBT, UPS, and the Fund each properly assumed that the documents of the abatement plan were controlling. The Central Supplement, and the CBA itself, were written after the abatement plan was accepted, and concerned the multiple funds of which UPS was a member; they were not written with the intention to override the Central States abatement plan. When read holistically, the governing documents do not require UPS to contribute to the Fund during the abatement period. Therefore, the trustees did not violate ERISA sec. 404(a)(1)(D) by failing to require such contributions.

2.

Sprague next advances that if UPS had no obligation to contribute during the abatement period, then the Fund's award of service credit and retirement benefits to UPS employees during that time was a violation of the Fund's governing documents and, therefore, of ERISA sec. 404(a) (1)(D). This argument is nearly impossible to support because we find, as the district court did, that UPS had no contribution obligation because the Kubalanza letter and the letter of agreement are integral components of the governing documents. Therefore, the argument that the award of credits and benefits violates the documents of the agreement is belied by the language of the letter of agreement--a crucial governing document--itself:

During this period, the Pension Fund shall grant contributory service credit for all purposes on behalf of all eligible employees of the Company who worked and were entitled under the new collective bargaining agreement to have pension contributions on their behalf.

The analysis here is the same as that above. UPS, IBT, and the Fund intended for the documents comprising the abatement plan to be controlling as to the behavior of UPS and the Fund during the months of August through December 1997. The trustees, therefore, did not fail to act in accordance with the governing documents and did not breach their fiduciary duty under ERISA sec. 404(a)(1)(D). The Fund's Plan does state that "[a] participant shall earn

contributory service credit for any employment with a contributing employer required to make employer contributions on his behalf according to a collective bargaining agreement." However, the governing documents must be read together in a way that reconciles provisions of a bargaining agreement. Diehl v. Twin Disc, Inc., 102 F.3d 301, 306 (7th Cir. 1996). The abatement plan provided a way for the Fund to remain financially sound by keeping UPS as a member who was obligated, but for five months, to contribute to the Fund through 2002. It is part of the overall collective bargaining agreement; UPS's employees, then, were entitled to credit so long as UPS was contributing according to the overall abatement agreement. It was, and no violation occurred.

## B. ERISA sec. 406

Sprague lastly urges that UPS and the Fund engaged in a per se prohibited transaction in violation of ERISA sec. 406 (a)(1)(B) or (D) which provide, in relevant part, that a fiduciary shall not knowingly cause the plan to engage in a transaction that constitutes a "(B) lending of money or other extension of credit between the plan and a party in interest, or "(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan."/1 This argument is easily disposed of, however, because it is viable only if UPS (the party in interest) had an obligation to contribute to the Fund during the abatement period. In that case, if the parties agreed that the Fund would not collect the delinquent contributions, the arrangement may be deemed a prohibited transaction. See Prohibited Transaction Exemption 76-1, 41 Fed. Reg. 12740, 12741 (1976). If no obligation existed, however, then no extension of credit was granted or received, and no transfer of plan assets took place. As discussed above, UPS had no obligation under the governing documents to contribute to the Fund during the abatement period. Therefore, no prohibited transaction occurred under ERISA sec. 406(a)(1).

## III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of the defendants.

FOOTNOTE

/1 Sprague amended his original claim to name UPS as a defendant to the prohibited transaction charge after the Supreme Court held that a plan participant under ERISA may maintain a direct action against a nonfiduciary party in interest in Harris Trust and Savings Bank v. Salomon Smith Barney, Inc., 530 U.S. 238 (2000).