COOPERATIVE STREET RAILWAY
SHOP EMPLOYEES ASSOCIATION
OF NEW ORLEANS, Plaintiff,

v.

NEW ORLEANS PUBLIC SERVICE,
INC., Defendant.

Civ. A. No. 72–350.

United States District Court,
E. D. Louisiana.

Nov. 20, 1972.

Lawrence L. McNamara, New Orleans, La., for plaintiff.

Michael J. Molony, Jr., New Orleans, La., for defendant.

ALVIN B. RUBIN, District Judge:

The Shop Employees, a union, seeks to compel New Orleans Public Service, Inc. ("NOPSI") to pay its members an additional wage increase of $1.85 effective July 1, 1970, in addition to the general wage increase incorporated into their written collective bargaining contract of 5.75%, effective July 1, 1970 through June 30, 1971. The suit is based on an oral agreement that is conceded to be binding as a supplement to the written document. But the parties dispute both the terms and the interpretation of this oral addendum.

FACTS

NOPSI is a public utility engaged in furnishing electricity, gas and transit services to consumers in the City of New

Orleans. Its employees are represented by six different unions; each union bargains separately and has a separate agreement with NOPSI. All of the agreements then in effect expired June 30, 1970. Prior to that time, negotiations were commenced between NOPSI and each union, in accordance with the prior general practice.

NOPSI and the Shop Employees reached an agreement on June 15, 1970 and signed its written text on June 23, 1970. This agreement set forth the wages, hours and conditions of employment for the Shop Employees unit. It provided for a general wage increase of 5.75% for the period July 1, 1970, through June 30, 1971. It is supererogatory to delineate the precise differences in the various versions of what was said during the six negotiating sessions with the Shop Employees; [1] a preponderance of the evidence supports the conclusion that in addition to what they put in writing the parties agreed orally that, if any of the other five labor organizations representing NOPSI's employees obtained a general wage increase in excess of the one negotiated by Shop Employees, the employees represented by the Shop Employees would be entitled to an additional increase to equalize their general wage adjustment with the increase paid to the other labor organization, unless the increase resulted from arbitration. A similar agreement had usually been made in the past with each union. These compacts, taken together, equalized all general wage increases whether a particular union was the first or last to reach an agreement with NOPSI; they induced each union to agree without awaiting the outcome of another union's negotiation. But they put wage increases beyond the hazard of arbitration.

But in 1970 there were two departures from the pattern: The Transit Operators (bus and street car operators) secured an agreement from NOPSI that its employees would receive any general wage increase subsequently granted either by normal negotiations or by arbitration award to employees represented by any other labor organization. In addition, one of the six unions, Electric Distribution, failed to come to terms with NOPSI and, pursuant to the agreement for the preceding year, the wage increase to be paid employees it represented was arbitrated. As a result, these Electric Distribution employees received a 7.6% wage increase for the year July 1970—June 30, 1971. Thereafter, 1.85% additional was paid to the Transit Operators group.

Shortly thereafter, NOPSI granted the differential increase of 1.85% to Transit Operators, retroactive to July 1, 1970 for the year July 1, 1970—June 30, 1971. NOPSI refused to grant this increase to Shop Employees (or to members of the other three unions).

The issue then, is whether persons represented by the Shop Employees are entitled to an additional general wage increase of 1.85% for the period July 1, 1970 through June 30, 1971. This also may affect the wage rates paid them for subsequent periods, for the agreements for later years were for percentage increases based on the prior rates.

In establishing standards for the construction of collective bargaining agreements, the Supreme Court has said:

"A collective bargaining agreement is not an ordinary contract for the purchase of goods and services, nor is it governed by the same old common-law

1. The only written memoranda are contained in contemporaneous reports made by the company's negotiator to his superior:

"A statement that if any other Association got anything higher or better or Companywide items than we agreed on we would get the higher or better also

except that if arbitration was involved we would get what was agreed upon." "All present were reminded that if some other Association received something better than we did, we would also receive it if it were a companywide item unless it came through arbitration."

concepts which control private contracts." Transportation-Communication Employees Union v. Union Pacific Railroad, 1966, 385 U.S. 157, 87 S. Ct. 369, 17 L.Ed.2d 264; John Wiley & Sons v. Livingston, 1964, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898.

"In order to interpret such an agreement it is necessary to consider the scope of other related collective bargaining agreements, as well as the practice, usage and custom pertaining to all such agreements."

█ Thus, the oral agreement must be construed in the context of the 1970 bargaining sessions, and in relation to other related collective bargaining agreements and the practices followed with respect to all such agreements.

The Transit Operators Association negotiated for and subsequently received an increase in wages exceeding that negotiated by the Shop Association. This was gained solely as a result of its collective bargaining agreement and without resort by the Transit Operators to arbitration.

█ Of course, this not only followed, but was a result of, the arbitration award to the Electrical Distribution employees. As to the Transit Workers, however, it was a negotiated increase, and its effect on the Shop Employees should be no different than if the Transit Workers had agreed to an increase of 5.75% plus such increase as resulted from a change in the cost of living, a change in food prices, or any other extraneous factor. The company in effect made a more favorable deal with the Transit Workers than it made with the Shop Employees with respect to the general wage level. Both the letter and the purpose of the oral agreement require the benefit of this more favorable arrangement to be accorded the Shop Employees.

To put it differently, NOPSI's grant of the additional 1.85% wage increase to the Transit Operators was a direct result of their regular and normal contract negotiations. The agreement to grant an additional increase to the Transit Operators, although oral, was made by NOPSI in the course of and during the normal and regular contract negotiations for the contract of July 1, 1970 through June 30, 1971. This understanding with respect to an additional increase in wages was, in effect, incorporated into and became a part of NOPSI's contract with the Transit Operators consummated during normal and regular negotiations. The Transit Operators Association did not arbitrate wage rates with NOPSI, nor is the Shop Employees' claim based on the award to the Electrical Distribution Association.

NOPSI has suggested to the court that its purpose in making oral agreements with employee associations is to assure the association's negotiators that their group will receive general wage increases equal to that negotiated by any other association. This statement evidences an intent to assure the several unions that all of their members will be treated equally with regard to general across-the-board wage increases. The evidence is persuasive that such oral agreements are also intended to induce the several unions to sign written contracts and to give them and their members a sense of security that, if others do better later, those who reach accord earlier will not suffer.

Calling the Transit Workers agreement "unique" or "singular" does not alter the situation. The Shop Employees were assured that they would receive the benefit of the concessions made other unions, usual or unusual. Nor does the failure of three unions to assert this claim (for whatever reason) mitigate against the rights of the plaintiff. That failure is not evidence of an interpretation of the oral assurances given the Shop Employees negotiator—or indeed evidence of an interpretation of any other agreement. It is mere forbearance to assert a claim, which may be pressed after the success of the plaintiff here.

The circumstances surrounding the 1970 negotiations and the oral agree-

ment entered by plaintiff and NOPSI evidence the intent that the members of plaintiff association would receive the same general wage increase paid the Transit Workers.

Prescription does not begin to run prior to the occurrence of the events that gave rise to the claim sued upon. See Succession of Berthelot, 1 Cir. La. App.1945, 24 So.2d 185, 188. See also Succession of Joublanc, 1941, 199 La. 250, 5 So.2d 762, at 764.

For these reasons, judgment will be rendered in favor of the plaintiff and against the defendant.