287 F.3d 886
 Kelsey GRAMMER, an individual; Grammnet, Inc., a California Corporation, Plaintiffs-Appellants,
v.
The ARTISTS AGENCY, a business association of unknown form, Defendant-Appellee.
Kelsey Grammer, an individual; Grammnet, Inc., a California Corporation, Plaintiffs-Appellees,
William Morris Agency, Inc., Appellant,
v.
The Artists Agency, a business association of unknown form, Defendant-Appellee.
Kelsey Grammer, an individual; Grammnet, Inc., a California Corporation, Plaintiffs-Appellants,
v.
The Artists Agency, a business association of unknown form, Defendant-Appellee.
Kelsey Grammer, an individual; Grammnet, Inc., a California Corporation, Plaintiffs, and
William Morris Agency, Inc., Appellant,
v.
The Artists Agency, a business association of unknown form, Defendant-Appellee.
 No. 00-56994.
 No. 00-57061.
 No. 01-55114.
 No. 01-55124.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted February 14, 2002.
 Filed April 29, 2002.
 
 Martin D. Singer and Lynda B. Goldman, Lavely & Singer, Los Angeles, CA, for the plaintiffs, plaintiffs-appellants, and plaintiffs-appellees.
 William T. Rintala, Rintala, Smoot, Jaenicke & Rees, Los Angeles, CA, for the appellant.
 Marcia J. Harris and Andrew F. Kim, Alschuler, Grossman, Stein & Kahan, Los Angeles, CA, for the defendant-appellee.
 Appeal from the United States District Court for the Central District of California, Dean D. Pregerson, District Judge, Presiding. D.C. No. CV 00-08571 DDP.
 Before FERGUSON, TASHIMA, and GRABER, Circuit Judges.
 OPINION
 TASHIMA, Circuit Judge.
 
 
 1
 Plaintiffs Kelsey Grammer and Grammnet, Inc. (collectively, "Grammer"), and William Morris Agency, Inc., appeal a district court order confirming a Screen Actors Guild ("SAG") labor arbitration award, totaling over $2 million in unpaid commissions. Grammer argues that the arbitrators made factual findings unsupported by the record and that they exceeded their jurisdiction. We have jurisdiction under 28 U.S.C. § 1291, and we affirm the district court.
 
 I. FACTUAL BACKGROUND
 
 2
 The Artists Agency ("Artists Agency") began representing Grammer in the 1980s, representation that included both Grammer's television and motion picture projects. Grammer became increasingly dissatisfied with Artists Agency in the early 1990s, as its representation had secured no motion picture projects for him and Grammer's two most significant television projects ("Cheers" and "Frasier") were not obtained through Artists Agency.
 
 
 3
 Grammer sought modification of his Artists Agency contract so that he could seek alternative representation for potential theatrical motion picture projects. After some negotiation, Grammer and Artists Agency agreed in January 1995 that, in exchange for Grammer's extending for two years his television and commercial obligations to Artists Agency (the "renewal contracts"), Artists Agency would substantially release Grammer from his theatrical motion picture obligations (the "settlement agreement") (collectively, the "1995 agreements"). The settlement agreement was executed on January 11, 1995. The renewal contracts were executed on January 17, 1995, were post-dated to commence on May 20, 1996, and expired May 20, 1998.
 
 
 4
 Artists Agency filed the renewal contracts with SAG in May 1995, but they were originally rejected. Counsel for Artists Agency contacted Joan Meyer ("Meyer"), SAG's Executive Administrator, explained the arrangement forged between Grammer and Artists Agency, and forwarded to her the settlement agreement as evidence of that arrangement.[1] Satisfied that the renewal contracts were in the best interests of Grammer, and that both sides had been competently represented by counsel, Meyer accepted the renewal contracts for filing with SAG.
 
 
 5
 In August 1996, Grammer terminated his relationship altogether with Artists Agency and, in August 1998, Grammer stopped paying commissions to Artists Agency. Grammer denied any obligations to Artists Agency, arguing that the 1995 agreements violated Rule 16(g) of the collective bargaining agreement ("CBA") among SAG, the Association of Talent Agents ("ATA"), and the National Association of Talent Representatives.[2] Grammer alleged that the 1995 agreements: (1) were post-dated so that the execution date and the commencement date did not correspond, in violation of Rule 16(g) § IV(C)(4)(a); (2) effectively spanned longer than three years as a result of this post-dating, in violation of Rule 16(g) § IV(C)(4)(a); (3) were executed prior to the last third of the term of the previous contract between Grammer and Artists Agency, in violation of Rule 16(g) § IV(D)(3); and (4) were filed more than 15 days after their execution, in violation of Rule 16(g) § IV(C)(1). Any one of these violations arguably voids the renewal contracts.[3] When Artists Agency filed a statement of claim with SAG, seeking payment of the commissions allegedly due, Grammer counterclaimed, alleging that Artists Agency owed him commissions already paid pursuant to those purportedly void contracts.
 
 
 6
 A three-member arbitration panel held hearings over the course of 18 days, at which witnesses were examined and cross-examined, and documentary evidence was introduced.[4] The panel determined that the 1995 agreements were valid, that Artists Agency had enforceable rights pursuant to those 1995 agreements, that those rights entitled Artists Agency to more than $2 million in back commissions, and that Grammer's counterclaim was without merit. Specifically, the panel found that, while "[i]t is not disputed that the Settlement Agreement effected a transaction that was at variance from Rule 16(g)," Meyer had de facto granted a waiver of that variance after reviewing the settlement agreement, determining that Grammer's interests were both furthered and protected by legal counsel, and accepting the renewal contracts and settlement agreement for filing with SAG.
 
 
 7
 Grammer then filed this action for a declaration vacating the labor arbitration award. Grammer alleged that: (1) the arbitration panel did not apply the plain language of Rule 16(g), which would have rendered the 1995 agreements void and unenforceable; (2) there was no evidence in the record to support a finding that SAG had granted Artists Agency a waiver for its Rule 16(g) violations; (3) even if the 1995 agreements were valid, their execution in January 1995 voided the pre-existing agency agreement between Grammer and Artists Agency, meaning that Grammer owed Artists Agency no commissions for income derived between January 1995 and November 1996; and (4) the arbitration panel lacked jurisdiction to award Artists Agency a $36,000 commission on "consulting fees" paid to Grammer while working on the television show "Frasier." The district court rejected these arguments, confirmed the arbitration award, and denied Grammer's counterclaim.
 
 II. STANDARD OF REVIEW
 
 8
 We review de novo the confirmation of an arbitration award. First Options, Inc. v. Kaplan, 514 U.S. 938, 947-48, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); Haw. Teamsters Union, Local 996 v. United Parcel Serv., 241 F.3d 1177, 1180 (9th Cir.2001). Although we apply "ordinary, not special standards" when reviewing a trial court's confirmation of an arbitration award, First Options, 514 U.S. at 948, 115 S.Ct. 1920, we nonetheless afford labor arbitration awards "nearly unparalleled... deference."[5] Stead Motors v. Auto. Machinists Lodge No. 1173, 886 F.2d 1200, 1204 (9th Cir.1989) (en banc); Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509, 121 S.Ct. 1724, 149 L.Ed.2d 740 (2001) (per curiam) ("[I]f an `arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that `a court is convinced he committed serious error does not suffice to overturn his decision.'") (quoting E. Assoc'd Coal Corp. v. UMW, 531 U.S. 57, 62, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000)); United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) ("As long as the arbitrator's award `draws its essence from the collective bargaining agreement,' and is not merely `his own brand of industrial justice,' the award is legitimate.") (quoting Steelworkers, 363 U.S. at 597, 80 S.Ct. 1358); Tanoma Mining Co. v. Local Union No. 1269, UMW, 896 F.2d 745, 748 (3d Cir.1990) ("An arbitration award draws its essence from the bargaining agreement if the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indica of the parties' intention." (internal quotation marks and citations omitted)).
 
 
 9
 We presume that factual findings underlying a labor arbitration award are correct, rebuttable only by a clear preponderance of the evidence. Carpenters Pension Trust Fund v. Underground Constr. Co., 31 F.3d 776, 778 (9th Cir.1994) (citing 29 U.S.C. § 1401(c)); see also Garvey, 532 U.S. at 509, 121 S.Ct. 1724 ("When an arbitrator resolves disputes regarding the application of a contract, and no dishonesty is alleged, the arbitrator's `improvident, even silly, factfinding' does not provide a basis for a reviewing court to refuse to enforce the award." (quoting Misco, Inc., 484 U.S. at 39, 108 S.Ct. 364)).
 
 III. DISCUSSION
 
 10
 All parties agree that the 1995 agreements violate the terms of Rule 16(g). We must decide whether the arbitration panel erred in concluding that the 1995 agreements were nevertheless enforceable. We hold that the arbitration panel's decision to enforce the 1995 agreements was a reasonable interpretation of the CBA; we therefore affirm the district court.
 
 A. Waiver of Rule 16(g) Violations
 
 11
 At the very least, it is clear that the 1995 agreements were: (1) executed and set to commence on different dates, in violation of Rule 16(g) § IV(C)(4)(a); (2) executed prior to the last third of the term on the previous contract between Grammer and Artists Agency, in violation of Rule 16(g) § IV(D)(3); and (3) filed more than 15 days after their execution, in violation of Rule 16(g) § IV(C)(1).[6] In light of these Rule 16(g) violations, the arbitration panel observed that "[i]t is not disputed that the Settlement Agreement effected a transaction that was at variance from Rule 16(g)," and the district court found that "the parties do not dispute that the various agreements at issue in the arbitration deviated from the standard regulations set forth in Rule 16(g)."
 
 
 12
 These Rule 16(g) violations, however, do not necessarily void the 1995 agreements. Grammer correctly observes that neither he nor Artists Agency ever requested a formal, written waiver from SAG. Citing Rule 16(g) § IV(J),[7] Grammer argues that the absence of such a formal, written waiver renders the arbitration panel's determination patently inconsistent with the plain language of Rule 16(g), and it therefore should be vacated. However, although Rule 16(g) instructs that such violations void applicable contracts and that waivers of violations must be issued by SAG in writing, these ostensibly "plain" provisions must be construed in the larger context of Rule 16(g) specifically and industry practice generally. When Rule 16(g) is considered in its entirety, its text is not as "plain" as Grammer suggests. The arbitration panel characterized Rule 16(g) as "sometimes contradictory"; ample evidence supports this conclusion. Initially, Rule 16(g) is facially inconsistent when it comes to prescribing how waivers ought to be granted. For example, while § IV(J) suggests that waivers cannot be offered without SAG's written consent, § IV(C)(1) provides that "inadvertent error or oversight... shall be deemed waived unless the objection of invalidity is raised by the actor or SAG within 60 days." Furthermore, at one point, § IV(B) provides:
 
 
 13
 Except as otherwise herein expressly provided no addendum, deviation, addition, deletion or other form of modification shall be made in the contract save with written approval of SAG. Any such addendum, deviation, addition, deletion or other form of modification shall be submitted by the agent to the SAG in writing within fifteen (15) days after the same is made if the contract is executed in the State of California.... Such approval shall be granted as a matter of course by SAG if the contract in fact be more favorable to the member.
 
 
 14
 The same section, however, subsequently provides:
 
 
 15
 In the event SAG fails to indicate its disapproval of such modifications within ten days from the date of filing, it shall be deemed approved. SAG may waive the modification filing requirement hereinabove set forth, in which event the agency contract filed with SAG shall be marked so as to reflect that there is a modification thereof which has not been filed with SAG as a result of the waiver.
 
 
 16
 Id. Contradictions such as these led Karen Stuart ("Stuart"), the executive director of the ATA, to testify that Rule 16(g) "is riddled with inconsistencies and that is why custom and practice become important and SAG and ATA speak almost daily because there are problems in interpreting this agreement."
 
 
 17
 Additionally, while arbitrators cannot ignore the plain wording of collectively bargained contracts, they also are "not confined to the express terms of the contract... [They] may also consider the industrial common law which is equally a part of the collective bargaining agreement although not expressed in it." Haw. Teamsters, 241 F.3d at 1181 (citation and internal quotation marks omitted); see also Transp.-Communication Employees Union v. Union Pac. R.R., 385 U.S. 157, 160-61, 87 S.Ct. 369, 17 L.Ed.2d 264 (1966) (holding that a CBA is not a private contract between two private parties but, rather, is a generalized code to govern a myriad of cases and parties, which cannot be interpreted without considering the practice, usage and custom pertaining to all such agreements); Cannery Warehousemen, Local Union No. 748 v. Haig Berberian, Inc., 623 F.2d 77, 82 (9th Cir. 1980) (noting that arbitrators may employ "industrial common law" to interpret a CBA).
 
 
 18
 There was sufficient evidence to sustain the arbitration panel's finding that SAG waived the variances between Rule 16(g) and the 1995 agreements. Meyer testified that SAG generally will accept agreements that do not strictly comport with the requirements of Rule 16(g) when there are side agreements protecting the actor and the agent. Furthermore, both Meyer and Stuart testified that SAG occasionally overlooks Rule 16(g) violations of the exact type asserted by Grammer, without the use of formal waivers. In light of this testimony, which explains the course and practice of SAG's Rule 16(g) interpretation,[8] the arbitration panel's finding that SAG had granted a waiver by filing the renewal contracts easily meets the deferential standard of review that this court must apply.[9]
 
 
 19
 B. Contractual Obligations Between January 1995 and May 1996
 
 
 20
 Grammer argues that even if the arbitration panel correctly held that SAG had granted waivers for the 1995 agreements' Rule 16(g) violations, when those agreements were executed in January 1995, the pre-existing agency contract between Grammer and Artists Agency[10] was automatically terminated.[11] Because the 1995 renewal contracts did not go into effect until May 1996, Grammer argues that there was no agency contract in effect between January 1995 and May 1996, and that Artists Agency is not entitled to commissions stemming from that period. The arbitration panel rejected this argument, finding that an agency agreement was in effect between January 1995 and May 1996. The district court affirmed this conclusion as a reasonable interpretation of Rule 16(g), and we affirm this district court holding.
 
 
 21
 The thrust of Meyer's and Stuart's testimony was that Rule 16(g) merely provides a default framework to protect the interests of actors and agents and that these rules can be waived when the parties are represented by counsel and (particularly) when the agreement in question benefits the SAG member. Here, Grammer was seeking to get out of contractual obligations to Artists Agency so that he could seek theatrical motion picture representation with United Talent Agency. The 1995 agreements permitted him to do exactly that, so long as he extended his television representation obligations to Artists Agency for an additional two years.
 
 
 22
 Grammer now tries to use a technicality found in Rule 16(g) § IV(D)(3) to assert that the 1995 agreements left him altogether uncommitted to Artists Agency from January 1995 to March 1996. This purported "lapse" in Grammer's and Artist Agency's contract, however, was an eventuality clearly not contemplated by the parties when forming the 1995 agreements. In fact, Grammer's interpretation of the 1995 agreements is belied by the fact that Artists Agency represented Grammer in November 1995 during negotiations with Paramount Studios. Obviously, Artists Agency would not have represented Grammer in these negotiations had it not believed that the 1993 agency agreement was still in effect. And, by permitting Artists Agency actively to represent him and to pursue his interests during this period, Grammar clearly intended that the representation continue uninterrupted.
 
 
 23
 Given that Rule 16(g) violations can be waived by SAG when the parties are represented by counsel, when the waiver is consistent with the parties' assent, and when the waiver benefits the SAG member, it was reasonable for the arbitration panel to find that a valid agency contract existed between Grammer and Artists Agency from January 1995 to May 1996.
 
 C. Consulting Fees
 
 24
 The arbitration panel awarded Artists Agency $36,000 in commissions on Grammer's consulting fees. Pointing to the absence of a "consulting" category in the CBA, Grammer argues that SAG (and by implication, the SAG arbitration panel) did not have jurisdiction to award consulting fee commissions.
 
 
 25
 The arbitration panel rejected this argument, finding that payment for consulting fees is within the scope of the renewal contracts and Rule 16(g), which provides:
 
 
 26
 Rule 16(g) shall, commencing August 1, 1975, apply to the representation of actors by agents in connection with, or relating to, the actor's employment or professional career as an employee in the production of motion pictures made for all purposes, uses and methods of exhibition including, without limitation, motion pictures made for theatrical, commercial, industrial, educational and television use, as provided in Article XII of the Basic Contract. Except as expressly provided to the contrary herein, all provisions of these Regulations shall apply to the representation of actors by agents in connection with their employment or professional careers as employees in television motion pictures.
 
 
 27
 Rule 16(g) § XXII (emphasis added). The arbitration panel determined that Grammer's consulting services were "in connection with" his television employment, and the district court concluded that this interpretation was reasonable.
 
 
 28
 We likewise conclude that the arbitration panel's determination was reasonable. Rule 16(g)'s language of "in connection with" is sufficiently vague to support the arbitration panel's interpretation and there is no contradictory provision that expressly precludes commissions on consulting fees. Thus, we defer to the arbitration panel and affirm its consulting fee award.
 
 IV. CONCLUSION
 
 29
 For the foregoing reasons, we hold that the labor arbitration panel acted reasonably in concluding that SAG waived violations of Rule 16(g), that a representation contract existed between Grammer and Artists Agency from January 1995 to March 1996, and that an award of commissions on consulting fees was permitted under the CBA. The district court's order confirming the arbitration award is, therefore,
 
 
 30
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The settlement agreement provided that Artists Agency was permitting Grammer to seek theatrical motion picture representation with another agency in exchange for extending his television representation commitment to Artists Agency for two years. It further states that the renewal contracts would be "deemed signed and delivered on or about May 20, 1995."
 
 
 [2]
 Rule 16(g) governs all aspects of the relationship between SAG members and "franchised" talent agents (i.e., those talent agents officially recognized by SAG). The CBA, inter alia, prohibits SAG members from dealing with non-franchised talent agents, requires that particular form contracts be used between SAG members and talent agents, dictates the manner in which SAG members and talent agents can enter into, and renegotiate, representation agreements, and limits the commission percentage that talent agents may charge SAG members.
 
 
 [3]
 Rule 16(g) § IV(C)(1) provides:
 All contracts not in writing or not complying with these Regulations, whether as to form, filling in of blanks, execution, delivery, filing or otherwise, shall be void except as hereafter provided. The agent shall have no right under such void contract to receive any commission on a reasonable or other basis for services rendered or otherwise....
 
 
 [4]
 Rule 16(g) requires that disputes between SAG members and franchised talent agents be resolved by arbitration:
 All disputes and controversies of every kind and nature whatsoever between an agent and his client arising out of or in connection with or under any agency contract between the agent and his client executed prior to, on, or since July 31, 1962, as to the existence of such contract, its execution, validity, the right of either party to avoid the same on any grounds, its construction, performance, non-performance, operation, breach, continuance, or termination, shall be submitted to arbitration regardless of whether either party has terminated or purported to terminate the same.
 Rule 16(g) § VI(A).
 
 
 [5]
 This limited scope of review is dictated by the context of collective bargainingSee Haw. Teamsters, 241 F.3d at 1181 ("Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept."); USW v. Enterprise Wheel & Car Corp., 363 U.S. 593, 596, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) ("The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards.").
 
 
 [6]
 Although Grammer asserts a fourth Rule 16(g) violation — that the renewal contracts effectively spanned longer than three years, in violation of Rule 16(g) § IV(C)(4)(a) — Artists Agency contests this characterization, arguing that the 1995 agreements expressly took effect upon the expiration of the pre-existing agency agreements (i.e., May 20, 1996), and thus had a term of only two years. Meyer testified that she interpreted the renewal contracts to have a term of only two years, the arbitration panel determined that the renewal contracts spanned only two years, and the district court affirmed this factual finding. We leave the district court's conclusion undisturbed
 
 
 [7]
 Rule 16(g) § IV(J) provides:
 Except as otherwise in these Regulations expressly provided, the actor may not waive any of the provisions of these Regulations or of the form agency contracts attached hereto, except with the written consent of SAG. Any attempted waiver without such consent is void.
 
 
 [8]
 Grammer argues that even if the arbitration panel correctly looked to custom and practice to interpret Rule 16(g), it erred when finding a waiver because "sporadic or occasional practices do not rise to the level of a custom or practice." While Artists Agency argues that SAG's pattern of informal waiver was sufficiently discernible to constitute a custom or practice, even if the arbitration panel legally erred in so finding, that legal error would not justify vacatur of the arbitration awardSee Misco, Inc., 484 U.S. at 38, 108 S.Ct. 364 ("[T]hat a court is convinced [the arbitrator] committed serious error does not suffice to overturn his decision.").
 
 
 [9]
 Grammer highlights sections in the factual record suggesting that Meyer was not aware that the renewal contracts had been post-dated when she filed them and that she might not have filed them had she been aware of their actual (January 1995) execution date. This contradictory evidence, however, was submitted to, and rejected by, the arbitration panel. On review, the district court held: "[E]ven if the Court were to determine that the [arbitration] panel drew a faulty conclusion from the evidence presented [regarding the existence of a waiver], the Court would not have the authority to reconsider the merits of the panel's decision. Because there is some factual support for the panel's conclusion that the requirements of Rule 16(g) were met, the Court may not questions this decision." Given that this court, too, must consider solely whether the arbitration panel interpreted the CBA, and not whether it did so correctly, the district court's conclusion is inescapable
 
 
 [10]
 Grammer had signed an agency agreement with Artists Agency in 1993, covering representation for television programs, which spanned three years, from May 20, 1993, to May 19, 1996
 
 
 [11]
 Rule 16(g) provides that a previous agency contract automatically terminates upon the execution of a new agency contract:
 The term of any such contract of extension or renewal of the term of any such new contract shall commence on the date of its execution, and the term of the prior contract shall thereupon terminate subject however to all rights and obligations which may have accrued thereunder at such time.
 Rule 16(g), § IV(D)(3).